# Illinois Official Reports

## Supreme Court

---

### *Schweihs v. Chase Home Finance, LLC*, 2016 IL 120041

---

| | |
|---|---|
| Caption in Supreme Court: | MELINDA SCHWEIHS, Appellant, v. CHASE HOME FINANCE, LLC, *et al.*, Appellees. |
| Docket No. | 120041 |
| Filed | December 15, 2016 |
| Rehearing denied | March 27, 2017 |
| Decision Under Review | Appeal from the Appellate Court of the First District; heard in that court on appeal from the Circuit Court of Cook County, the Hon. Daniel Lynch, Judge, presiding. |
| Judgment | Appellate court judgment affirmed. |
| | Cause remanded to the circuit court for further proceedings consistent with this opinion. |
| Counsel on Appeal | Edward T. Joyce, Jennifer L. Doherty, and Joan M. Mannix, all of Chicago, for appellant. |
| | Jeffrey S. Pavlovich and Gerard C. Fosco, of Leahy, Eisenberg & Fraenkel, Ltd., of Joliet, for appellees Safeguard Properties, Inc., Todd Gonsalez, and Edilfonso Centeno. |

Edward J. Lesniak, Susan M. Horner, and Daniel Klapman, of Burke, Warren, MacKay & Serritella, P.C., of Chicago, for appellee Chase Home Finance, LLC.

R. Sean Hocking, of Craig & Craig, LLC, of Mattoon, for *amicus curiae* Illinois Association of Defense Trial Counsel.

Justices
JUSTICE FREEMAN delivered the judgment of the court, with opinion.

Chief Justice Karmeier and Justices Thomas, Kilbride, Burke, and Theis concurred in the judgment and opinion.

Justice Garman specially concurred, with opinion.

## OPINION

¶ 1    This tort case arose out of foreclosure proceedings involving plaintiff Melinda Schweihs's home. Plaintiff sued defendants Chase Home Finance, LLC (Chase), Safeguard Properties, Inc. (Safeguard), Todd Gonsalez, and Edilfonso Centeno for numerous torts, including emotional distress, as a result of Gonsalez and Centeno entering her home. Her emotional distress claims, which are at issue here, were dismissed by the circuit court, and the appellate court affirmed. 2015 IL App (1st) 140683. This court allowed plaintiff's petition for leave to appeal. Ill. S. Ct. R. 315 (eff. Jan. 1, 2015). For the following reasons, we affirm the judgment of the appellate court.

¶ 2                                 I. BACKGROUND
¶ 3    In 1997, plaintiff executed a note secured by a mortgage for a home located in Northbrook, Illinois. Chase owned the mortgage. The mortgage contained a provision granting Chase the right, in the event of a default by plaintiff, to enter onto the property to make repairs. The provision reads as follows:

> "7. Protection of Lender's Rights in the Property. If Borrower fails to perform the covenants and agreements contained in this Security Instrument, or there is a legal proceeding that may significantly affect Lender's rights in the Property *** then Lender may do and pay for whatever is necessary to protect the value of the Property and Lender's rights in the Property. Lender's actions may include paying any sums secured by a lien which has priority over this Security Instrument, appearing in court, paying reasonable attorney's fees and entering on the Property to make repairs. Although Lender may take action under this paragraph 7, Lender does not have to do so."

- 2 -

¶ 4     Plaintiff defaulted on the mortgage in 2007. Chase filed a complaint to foreclose the mortgage against her and obtained a judgment of foreclosure on May 25, 2010. Plaintiff had the right to possession of her home until the redemption period expired on August 25, 2010.

¶ 5     To protect its interest in properties, Chase contracts with outside companies to provide property inspections and preservation services. Safeguard is one of those companies that provide national property monitoring and preservation services for residential properties in foreclosure. Safeguard's employees do not physically perform the inspections or render preservation services. Instead, Safeguard employs "Client Account Representatives" (CARs) who coordinate with local vendors, with whom Safeguard contracts. These local vendors, in turn, perform the inspections and preservation services.

¶ 6     On June 17, 2010, Safeguard's inspections department received a report from one of its vendors that plaintiff's property was vacant. Based on the report, a Safeguard CAR placed an "initial secure" order with A1 Builders, a local contractor that performs the property inspection services for which Safeguard contracted. An "initial secure" order may require a vendor to secure access to the property by changing one of the locks on the premises and to "winterize" the house by turning off the utilities. A1 in turn hires subcontractors, who perform the work orders. Gonsalez and Centeno worked as A1 subcontractors.

¶ 7     On June 22, 2010, Gonsalez and Centeno arrived at plaintiff's property to carry out the "initial secure" order. They were required to determine the occupancy status of the property before proceeding with the order. The order instructed them not to do any work if the property was occupied.

¶ 8     Gonsalez testified during his discovery deposition that he and Centeno conducted a visual inspection of the property. He observed that the grass on the property was uncut and the trees were overgrown. Gonsalez knocked on the front door but did not receive an answer. He also checked the gas meter and the water spout and determined that both utilities were turned off. He further observed a "for sale" sign at the property, along with a dumpster and a car parked in the driveway.

¶ 9     Gonsalez spoke with a neighbor who lived across the street from plaintiff's home. Gonsalez testified that the neighbor told him that the house was not occupied but a woman would come and go on occasion. She also said that there were no lights on at plaintiff's home at night. She did not recognize the car in plaintiff's driveway. She also informed him that there was a school down the street and that people from the school would park there knowing it was a vacant property.

¶ 10    Centeno testified during his discovery deposition that he did not talk with any neighbors but that he recalled that Gonsalez told him the neighbor stated that "they come and go. And sometimes they leave their vehicle there."

¶ 11    After speaking with the neighbor, Gonsalez again knocked on plaintiff's front door, without a response. Gonsalez and Centeno spent in excess of 45 minutes determining if the house was occupied. They also entered the backyard through a latched gate of the home's six-foot security fence. Gonsalez testified that he saw boxes piled on top of each other and garbage and debris on the floor, observing these through sliding glass doors. Gonsalez then contacted management at A1 Builders, relaying the abovementioned information. He was told to proceed with the work order.

- 3 -

¶ 12    To secure the premises, Gonsalez had to remove one of the secondary locks on the property. He removed the lock to the back door. Because of the boxes and debris blocking the entrance, Gonsalez could only open the door about a foot and had to climb over them to enter the home. Centeno remained at the back door and never entered the home. Once in the home, Gonsalez testified that he was confronted by a woman. Both parties were startled, and plaintiff stated that she wanted them out of her house and she was calling her lawyer. Gonsalez responded he was with the mortgage company and asked her to come to the front door to speak with him. Gonsalez then left and went around to the front and knocked on the front door, but plaintiff did not answer. Gonsalez and Centeno then waited for the arrival of the police.

¶ 13    At the time Gonsalez and Centeno arrived at plaintiff's home, she was a 58- year-old single woman who was living alone. Plaintiff testified during her discovery deposition that her home was in foreclosure; however, she anticipated selling her home while it was still in the redemption period. Plaintiff testified that when she placed the house for sale, she informed the realtor that the realtor was to accompany anybody that came to the property. She also testified that she was not showing the interior of the house because of the "mess" and "stuff everywhere" in piles and in boxes. She described herself as a "packrat" and testified she was in the process of packing her belongings, which were in disarray.

¶ 14    Plaintiff heard knocking on the front door while she was in the basement; however, she was on the phone and did not respond. After the phone call, plaintiff went to the second floor of her home to continue packing. She stated that she heard the flap drop on the metal mailbox attached to her house, at which time she looked out a second-floor window. Plaintiff testified that she saw two men standing in her driveway, along with a green truck facing the street, without any markings except for a "Harley" decal on the back window. Plaintiff thought that they may have been potential buyers looking at the house, and she decided to continue to pack.

¶ 15    A short time later, plaintiff heard noises coming from the back of the house. She went downstairs to identify the noise and encountered Gonsalez in the family room. She testified that Gonsalez was not wearing a uniform but was in street clothes with tattoos exposed. Centeno was in the open back doorway. Plaintiff testified that she spoke first and asked, "Who are you and what are you doing in my home?" Plaintiff testified that one of them told her in a "forceful way" that Chase had sent them to secure and winterize the house and that she needed to come outside to talk with them. She told them to leave and immediately called her attorney and the police. She stayed on the phone with the police dispatcher until the police arrived. The police investigated, speaking with plaintiff, Gonsalez, Centeno, and the neighbor with whom Gonsalez had spoken. No arrests were made. Gonsalez offered to replace the back-door lock with a new lock and key, but plaintiff declined.

¶ 16    Plaintiff testified that after the incident she was afraid while in her home and fearful that she may be attacked. On the same day of the incident, plaintiff went to the hospital because she "didn't feel right." Subsequently, she sought treatment, therapy, and medication from multiple doctors for issues with sleeping, post-traumatic stress, anxiety, and depression. Plaintiff stated that she felt anxiety when approaching her home and that at times she stayed in hotels because of her fear of subsequent break-ins. She was inhibited from packing and preparing her home for sale because of this fear. Additionally, she alleged that she sought temporary leave from her employment due to the incident but that her request was denied and she was instead terminated.

¶ 17    In October 2010, plaintiff filed a five-count complaint against defendants alleging trespass, negligent trespass, private nuisance, intentional infliction of emotional distress, and negligence. Extensive discovery and motion practice ensued. Defendants filed motions for summary judgment as to each of plaintiff's counts. On February 4, 2014, the circuit court heard argument on the motions, and plaintiff filed a motion for leave to amend the negligence count to negligent infliction of emotional distress.

¶ 18    On February 6, 2014, the court granted defendants' motions for summary judgment with respect to plaintiff's claims for private nuisance and intentional infliction of emotional distress. It denied defendants' motions with respect to the claims for trespass and negligent trespass, and those claims are still pending in the circuit court. The court also granted plaintiff's motion for leave to amend. It then dismissed the negligent infliction of emotional distress claim, as amended, pursuant to section 2-615 of the Code of Civil Procedure (Code). 735 ILCS 5/2-615 (West 2014). Finally, the court made a finding pursuant to Illinois Supreme Court Rule 304(a) (eff. Feb. 26, 2010) that there was "no just reason for delaying either enforcement or appeal or both." Thereafter, plaintiff filed a timely notice of appeal.

¶ 19    A divided appellate court affirmed, first addressing the negligent infliction of emotional distress claim. The court noted the two types of victims in emotional distress cases: bystanders and direct victims. It determined that plaintiff was a direct victim and must allege "some physical impact" from defendants' conduct. The court found that because she did not plead any physical contact, she could not establish a claim for negligent infliction of emotional distress and that count was properly dismissed. It further noted that its conclusion was consistent with this court's holdings in *Rickey v. Chicago Transit Authority*, 98 Ill. 2d 546, 555 (1983); *Corgan v. Muehling*, 143 Ill. 2d 296, 304 (1991); and *Pasquale v. Speed Products Engineering*, 166 Ill. 2d 337, 346-47 (1995). The court did acknowledge however, that certain language in *Pasquale* mischaracterized the holding in *Corgan*, which has led to some confusion in the courts. It concluded that the language in *Pasquale* was *obiter dictum* and not binding. 2015 IL App (1st) 140683.

¶ 20    The appellate court next addressed plaintiff's intentional infliction of emotional distress claim, finding that summary judgment was proper as a matter of law because plaintiff could not establish that defendants' conduct was "extreme and outrageous."

¶ 21    Justice Harris dissented regarding the negligent infliction of emotional distress claim, stating that the majority was wrong in continuing to require physical impact in claims for negligent infliction of emotional distress for direct victims. 2015 IL App (1st) 140683, ¶ 49 (Harris, J., dissenting).

¶ 22    We granted plaintiff's petition for leave to appeal. Ill. S. Ct. R. 315 (eff. Jan. 1, 2015). We also granted the Illinois Association of Defense Trial Counsel leave to submit an *amicus curiae* brief in support of defendants. Ill. S. Ct. R. 345 (eff. Sept. 20, 2010). We affirm the judgment of the appellate court.

¶ 23                                    II. ANALYSIS

¶ 24    On appeal, plaintiff argues that her claims for negligent infliction of emotional distress and intentional infliction of emotional distress should not have been dismissed. We first address plaintiff's claim for negligent infliction of emotional distress.

¶ 25                    A. Negligent Infliction of Emotional Distress

¶ 26        Plaintiff contends that her claim for negligent infliction of emotional distress should not
have been dismissed pursuant to section 2-615 of the Code because the controlling precedent
of this court establishes that physical impact is not a required element of a claim for negligent
infliction of emotional distress by a direct victim.

¶ 27        A motion to dismiss under section 2-615 of the Code challenges only the legal sufficiency
of the complaint. *Bonhomme v. St. James*, 2012 IL 112393, ¶ 34. The critical inquiry is
whether the allegations of the complaint, when considered in a light favorable to the plaintiff,
are sufficient to state a cause of action upon which relief may be granted. *Id.* All well-pled facts
in the complaint must be taken as true, but conclusions of law will not be taken as true unless
supported by specific factual allegations. *Id.* Review of the dismissal of a complaint under
section 2-615 of the Code is *de novo*. *Khan v. Deutsche Bank AG*, 2012 IL 112219, ¶ 47.

¶ 28        Plaintiff first argues that decisions of this court make clear that Illinois, like other
jurisdictions, has abandoned the impact rule. Plaintiff relies on this court's decision in *Corgan*,
which she claims established that a direct victim need only properly allege the accepted
elements of a negligence claim, including an emotional or psychological injury but without the
necessity of also proving a secondary physical impact or injury. Plaintiff further claims that
this court reaffirmed that principle in *Pasquale*.

¶ 29        Plaintiff also argues that the appellate court majority misinterpreted *Corgan* and *Pasquale*
and should not have disregarded language in *Pasquale* as *obiter dictum*. The language stated
that *Corgan* had "eliminated the contemporaneous injury or impact requirement for a direct
victim's recovery for emotional distress based on a theory of negligence." *Pasquale*, 166 Ill. 2d
at 346. This court reiterated similar statements two more times in *Pasquale*. *Id.* at 348-49.
Plaintiff maintains that this court's statements in *Pasquale* were entirely consistent with its
decision in *Corgan*. Plaintiff argues that, in accordance with our prior decisions, we should not
depart from settled precedent, which eliminated the contemporaneous physical impact or
injury requirement for direct victims.

¶ 30        Defendants and *amicus* contend that the impact rule is still the law in Illinois when a direct
victim pleads negligent infliction of emotional distress.

¶ 31        To address plaintiff's claim, we set forth this court's history of the impact rule and claims
for negligent infliction of emotional distress. Generally, to state a claim for negligent infliction
of emotional distress, a plaintiff must allege the traditional elements of negligence: duty,
breach, causation, and damages. *Corgan*, 143 Ill. 2d at 306. And until this court's decision in
*Rickey*, all plaintiffs were also required to allege a contemporaneous physical injury or impact.
*Braun v. Craven*, 175 Ill. 401, 419-20 (1898). This was known as the "impact rule." Under the
impact rule, a plaintiff could recover damages if he suffered (1) emotional distress and (2) " 'a
contemporaneous physical injury or impact.' " *Corgan*, 143 Ill. 2d at 303 (quoting *Rickey*, 98
Ill. 2d at 553). Prior to *Rickey*, there was no distinction between a direct victim and a bystander
in negligent infliction of emotional distress cases. Subsequently, in *Rickey*, this court drew
such a distinction.

¶ 32        In *Rickey*, an eight-year-old boy witnessed his five-year-old brother's clothing become
entangled in a subway escalator mechanism, resulting in the younger brother being choked and
unable to breathe for a substantial period of time. *Rickey*, 98 Ill. 2d at 549. The eight-year-old
boy brought an action through his mother against numerous defendants, alleging that as a result

of witnessing the accident to his brother, he sustained severe mental and emotional distress and psychiatric trauma. *Id.* The complaint alleged that the emotional distress manifested in physical injury, including "definite functional, emotional, psychiatric and behavioral disorders, extreme depression, prolonged and continuing mental disturbances, [and] inability to attend school." *Id.* at 550. This court adopted the "zone-of-physical-danger rule" for bystanders who allege negligent infliction of emotional distress. *Id.* at 555. Under the zone-of-physical-danger rule, "a bystander who is in a zone of physical danger and who, because of the defendant's negligence, has reasonable fear for his own safety is given a right of action for physical injury or illness resulting from emotional distress." *Id.* The rule does not require that the bystander suffer a physical impact or injury at the time of the negligent act, but it does require that he must have been in "such proximity to the accident in which the direct victim was physically injured that there was a high risk to him of physical impact." *Id.* Therefore, this court held that a bystander must show physical injury or illness as a result of the emotional distress, caused by the defendant's negligence and not a contemporaneous physical injury or impact. *Id.*

¶ 33    Subsequently, in *Corgan*, the plaintiff, who was a patient of a man who held himself out to be a licensed psychologist, sued the man for emotional damages because, under the guise of therapy, he sexually exploited her. *Corgan*, 143 Ill. 2d at 300. The plaintiff alleged that the defendant's conduct caused and still caused her to experience fear, shame, humiliation, and guilt. *Id.* She also alleged that the defendant's conduct compelled her to undergo more intensive and extensive psychotherapeutic care and counseling. *Id.* The circuit court certified questions for the appellate court, and the precise issue in *Corgan* was whether "as a direct victim of defendant's psychological malpractice, a question remains as to whether the complaint should be dismissed because the plaintiff did not allege that she suffered a physical injury or illness as a result of her emotional distress." *Id.* at 308. This court held that the requirement that the plaintiff allege a physical symptom as a result of the emotional distress caused by the defendant's negligence did not apply to direct victim cases. *Id.* at 312.

¶ 34    Also, in *Corgan*, this court made it clear that *Rickey* did not define the scope of negligent infliction of emotional distress as it applies to direct victims. *Id.* at 304. *Corgan* was a direct victim case, and the patient satisfied the impact rule; on multiple occasions, the psychologist had sexual relations with her. *Id.* at 300. Thus, *Corgan* is an example of the continued application of the impact rule in direct victim cases.

¶ 35    Moreover, in *Corgan*, the special concurrence clarified "that the only question before us, and the only one resolved by today's decision, is the question certified by the trial judge: whether this court's earlier opinion in *Rickey v. Chicago Transit Authority* (1983), 98 Ill. 2d 546, bars recovery of damages for emotional distress in the limited set of circumstances alleged here. We have, in the present case, answered that question in the negative." *Corgan*, 143 Ill. 2d at 316 (Miller, C.J., specially concurring).

¶ 36    Also of note is the case of *Pasquale*, 166 Ill. 2d at 339-40, where the husband of a spectator at a drag race, who was killed when she was struck by flying debris resulting from the failure of a clutch mechanism on a race car, brought an action against the race track, the manufacturer of the engine housing, and the distributor of the engine parts. When the mechanism failed, the plaintiff's wife was struck by the flying debris, and the plaintiff was then struck by his wife's body parts. *Id.* at 343. The complaint alleged a cause of action for a wrongful death sounding in

- 7 -

strict liability. *Id.* Although the plaintiff maintained that he was both a bystander and a direct victim, this court found that the plaintiff was a bystander because his emotional distress was not caused by being struck with flying debris. *Id.* at 347.

¶ 37　　Therefore, in *Pasquale*, this court confined its inquiry to "whether the elimination of the contemporaneous injury or impact requirement for bystander recovery for emotional distress in the area of negligence meaningfully translate[d] into an elimination of the element of physical harm for a bystander's recovery for emotional distress under strict liability theory." *Id.* This court determined that it did not and declined to reexamine the established rule that physical harm is required to state a bystander's cause of action and recovery based on strict liability. *Id.* at 349-50.

¶ 38　　This precedent makes clear that a direct victim's claims for negligent infliction of emotional distress must include an allegation of contemporaneous physical injury or impact. To the extent plaintiff argues that *Corgan* eliminated the impact rule for direct victims, a careful reading of *Rickey*, *Corgan*, and *Pasquale* indicates that this court did not eliminate the impact rule for negligent infliction of emotional distress claims brought by direct victims.

¶ 39　　Additionally, defendants have brought to our attention numerous appellate court decisions that have analyzed the elements necessary for a direct victim to plead negligent infliction of emotional distress and have correctly applied this precedent. See *Borcia v. Hatyina*, 2015 IL App (2d) 140559, ¶¶ 43-44 (observing that a cause of action for negligent infliction of emotional distress requires a plaintiff to allege facts establishing that she suffered a direct impact that caused emotional distress or that she was a bystander in a zone of physical danger that caused her to fear for her own safety and that she suffered physical injury or illness as a result of her emotional distress); see also *Doe v. Northwestern University*, 289 Ill. App. 3d 39, 47 (1997) (stating that Illinois courts permit a "plaintiff who has suffered a physical impact and injury due to a defendant's negligence [to] recover for emotional distress that the injury directly causes"); *Majca v. Beekil*, 289 Ill. App. 3d 760, 762-63 (1997) (same); *Doe v. Surgicare of Joliet, Inc.*, 268 Ill. App. 3d 793, 796 (1994) (holding that the plaintiff qualified as a direct victim due to the physical impact he suffered and acknowledging the requirement that the physical impact be contemporaneous with the occurrence); *Hayes v. Illinois Power Co.*, 225 Ill. App. 3d 819, 825 (1992) (holding that the plaintiff was a direct victim because he was electrocuted as a result of coming into contact with decedent who had been electrocuted); *Leonard v. Kurtz*, 234 Ill. App. 3d 553, 555-56 (1992) (finding there was no contemporaneous physical injury to the plaintiff sufficient to make her a direct victim).

¶ 40　　Furthermore, consistent with our understanding of *Rickey*, *Corgan*, *Pasquale*, and Illinois tort law, federal district courts applying Illinois law have held on several occasions that the impact rule applies to direct victims. See *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 703 (7th Cir. 2009) (observing that a direct victim of alleged negligent infliction of emotional distress must satisfy the "impact" rule); *Cleveland v. Rotman*, 297 F.3d 569, 574 (7th Cir. 2002) (stating that Illinois follows the "impact rule," which allows a plaintiff to recover for negligent infliction of emotional distress only if the distress is directly and causally related to a physical injury); *Kapoulas v. Williams Insurance Agency, Inc.*, 11 F.3d 1380, 1382 (7th Cir. 1993) (recognizing that when a direct victim claims emotional distress, the impact rule still applies).

¶ 41 Moreover, we agree with the appellate court's characterization of certain language referring to *Corgan*, in *Pasquale*, as *obiter dictum*. We note that to evaluate the precedential effect of this court's pronouncements concerning the impact rule, we must preliminarily examine general rules governing judicial statements. *Cates v. Cates*, 156 Ill. 2d 76, 79-80 (1993). The term "*dictum*" is generally used as an abbreviation of *obiter dictum*, which means a remark or opinion uttered by the way. *Id.* at 80; *Exelon Corp. v. Department of Revenue*, 234 Ill. 2d 266, 277-78 (2009). Such an expression or opinion as a general rule is not binding as authority or precedent within the *stare decisis* rule. *Cates*, 156 Ill. 2d at 80. On the other hand, an expression of opinion upon a point in a case argued by counsel and deliberately passed upon by the court, though not essential to the disposition of the cause, if *dictum*, is a judicial *dictum*. *People v. Palmer*, 104 Ill. 2d 340, 345-46 (1984) (indicating that precedential scope of decision is limited to facts before the court); see *Scovill Manufacturing Co. v. Cassidy*, 275 Ill. 462, 470 (1916); *Rhoads v. Chicago & Alton R.R. Co.*, 227 Ill. 328, 337 (1907); *Law v. Grommes*, 158 Ill. 492, 494 (1895); *Cohens v. Virginia*, 19 U.S. 264, 399 (1821) (stating that "[i]t is a maxim not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit when the very point is presented for decision").

¶ 42 This court wrote in *Pasquale* that *Corgan* had "eliminated the contemporaneous injury or impact requirement for a direct victim's recovery for emotional distress on a theory of negligence." *Pasquale*, 166 Ill. 2d at 346. In fact, as previously stated, in *Corgan*, this court addressed whether a direct victim of negligent infliction of emotional distress had to allege that she suffered a physical symptom of her emotional distress. *Corgan*, 143 Ill. 2d at 308; see *Brogan v. Mitchell International, Inc.*, 181 Ill. 2d 178, 184-85 (1998). This court held that she did not. *Corgan*, 143 Ill. 2d at 312. *Corgan* did not address the impact rule, and in fact there was no question in that case that the plaintiff had suffered a physical impact, as her claim rested on allegations of sexual relations with her therapist. *Id.* at 300. Thus, *Corgan* did not eliminate the need for a direct victim to allege and prove a contemporaneous physical injury or impact. *Id.* at 304, 312; *Braun*, 175 Ill. at 420; *Kapoulas*, 11 F.3d at 1382. Further, *Pasquale* concerned a cause of action based on strict liability, and its mischaracterization of *Corgan*'s holding was not a factor in the issue on appeal in *Pasquale*. Therefore, we find that this court's statements in *Pasquale* that *Corgan* eliminated the contemporaneous injury or impact requirement for a direct victim's recovery for emotional distress are *obiter dictum* and thus are not binding authority or precedent.

¶ 43 Now we turn to the allegations in plaintiff's amended complaint to determine whether they are sufficient to state a cause of action for negligent infliction of emotional distress and thus survive a motion to dismiss under section 2-615 of the Code. Plaintiff alleges that Chase and Safeguard had a duty to use reasonable care in training their employees, agents, and contractors and that Chase breached its duty by failing to properly train and supervise its employees, agents, and contractors regarding how to determine whether a property is abandoned and how to proceed when they are uncertain as to whether a property is abandoned. Also, it is alleged that defendants had a duty to use reasonable care not to interfere with plaintiff's right and interest in the private use and enjoyment of her home and that defendants breached this duty of care by "(a) negligently determining that the property was 'vacant,'" "(b) negligently entering a report that labeled the property as 'first time vacancy,'"

"(c) negligently employing a system that permits an 'initial secure' work order to be placed and carried out without first obtaining a court order finding that [p]laintiff had 'abandoned' the property as required by both 735 ILCS 5/15-1603[1] and the Judgment of Foreclosure order," "(d) negligently instructing *** Gonsalez and Centeno to carry out the 'initial secure' work order when it was clear that the property was neither vacant nor abandoned" and "(e) negligently carrying out the 'initial secure' work order even though it was clear that the property was neither vacant nor abandoned." Finally, plaintiff sought damages for the injuries sustained by her as a direct and proximate result of defendants' actions.

¶ 44    As previously determined, the pleading requirements for a direct victim's recovery for negligently inflicted emotional distress include an allegation of a contemporaneous physical injury or impact. Therefore, since plaintiff did not include an allegation of a physical impact, as a direct victim, she failed to allege a cause of action for negligent infliction of emotional distress. Thus, we conclude that the negligent infliction of emotional distress count of her complaint was properly dismissed.

¶ 45                        B. Intentional Infliction of Emotional Distress

¶ 46    Initially, we respond to defendants' argument that plaintiff has forfeited review of her intentional infliction of emotional distress claim. Defendants point out that plaintiff's November 4, 2015, petition for leave to appeal sought review of both her negligent infliction of emotional distress claim and intentional infliction of emotional distress claim. However, this court denied the petition in its entirety, and plaintiff filed a motion to reconsider on February 1, 2016. Defendants maintain that, because plaintiff solely referenced her negligent infliction of emotional distress claim and so limited her motion, she has forfeited further review of her intentional infliction of emotional distress claim. We disagree. In this court's order dated February 23, 2016, plaintiff's motion for reconsideration was allowed. The order of January 20, 2016, denying the petition for leave to appeal was vacated, and the petition for leave to appeal was allowed. Thus, the court allowed the petition in its entirety, and plaintiff has not forfeited review of her claim for intentional infliction of emotional distress. Ill. S. Ct. R. 315 (eff. Jan. 1, 2015); *Central Illinois Light Co. v. Home Insurance Co.*, 213 Ill. 2d 141, 152 (2004).

¶ 47    We now address plaintiff's contention that it was improper to grant summary judgment on her intentional infliction of emotional distress claim because there was a question of fact as to whether Gonsalez and Centeno's conduct was extreme and outrageous.

¶ 48    Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2-1005(c) (West 2014). Summary judgment is a drastic measure and should only be granted if the movant's right to judgment is clear and free from doubt. *Adams v. Northern Illinois Gas Co.*, 211 Ill. 2d 32, 42-43 (2004). Where a reasonable person could draw divergent inferences from undisputed facts, summary judgment should be denied. *Id.* In determining the existence of a genuine issue of material fact, courts must consider the pleadings, depositions, admissions, exhibits, and affidavits on file in the case and must construe them strictly against the movant and liberally in

---

[1]Section 15-1603 of the Code allows a court to shorten the redemption period if the court finds that the property has been abandoned. 735 ILCS 5/15-1603 (West 2014).

favor of the opponent. *Id.* In appeals from summary judgment rulings, we conduct a *de novo* review. *Standard Mutual Insurance Co. v. Lay*, 2013 IL 114617, ¶ 15 (citing *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 102 (1992)).

¶ 49    In Illinois, the tort of intentional infliction of emotional distress was first recognized in *Knierim v. Izzo*, 22 Ill. 2d 73, 87 (1961), in which a widow was permitted to maintain such an action against the person who had killed her husband. It was not until 1976, however, that this court (relying on Restatement (Second) of Torts § 46 (1965)) outlined the requirements for the tort. *Public Finance Corp. v. Davis*, 66 Ill. 2d 85, 90 (1976).

¶ 50    First, the conduct involved must be truly extreme and outrageous. Second, the actor must either intend that his conduct inflict severe emotional distress or know that there is at least a high probability that his conduct will cause severe emotional distress. Third, the conduct must in fact cause severe emotional distress. *McGrath v. Fahey*, 126 Ill. 2d 78, 86 (1988) (citing *Public Finance*, 66 Ill. 2d at 90).

¶ 51    It is clear that the tort "does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." Restatement (Second) of Torts § 46 cmt. d, at 73 (1965); *McGrath*, 126 Ill. 2d at 86. "It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Restatement (Second) of Torts § 46 cmt. d, at 73 (1965); *Public Finance*, 66 Ill. 2d at 90. "The law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it. The intensity and the duration of the distress are factors to be considered in determining the severity." Restatement (Second) of Torts § 46 cmt. j, at 77-78 (1965); *McGrath*, 126 Ill. 2d at 86; *Public Finance*, 66 Ill. 2d at 90.

¶ 52    Several factors have been identified that should be considered in determining whether a defendant's conduct may be deemed outrageous. *Kolegas v. Heftel Broadcasting Corp.*, 154 Ill. 2d 1, 21 (1992). The extreme and outrageous nature of the conduct may arise from the defendant's abuse of some position that gives him authority over the plaintiff or the power to affect the plaintiff's interests. *Id.* (citing *McGrath*, 126 Ill. 2d at 86-87). A factor to be considered is also the reasonableness of a defendant's belief that his objective is legitimate. *McGrath*, 126 Ill. 2d at 89. Another factor to be considered is the defendant's awareness that the plaintiff is particularly susceptible to emotional distress. *Kolegas*, 154 Ill. 2d at 21 (citing *McGrath*, 126 Ill. 2d at 89-90). Those factors are to be considered in light of all of the facts and circumstances in a particular case, and the presence or absence of any of these factors is not necessarily critical to a cause of action for intentional infliction of emotional distress. *McGrath*, 126 Ill. 2d at 90. The outrageousness of a defendant's conduct must be determined in view of all the facts and circumstances pled and proved in a particular case. *Id.*

¶ 53    Specifically, plaintiff argues that the conduct of Gonsalez and Centeno was extreme and outrageous because (a) breaking into someone's locked home constitutes extreme and outrageous conduct and (b) there was no justification for the forcible break-in by those defendants.

¶ 54        Here, we find that the conduct of Gonsalez and Centeno did not rise to the level of extreme and outrageous. We observe that the record reveals that Gonsalez and Centeno conducted an investigation to determine whether the house was occupied. While there were signs that the house was not abandoned, such as the presence of the dumpster and a vehicle, Gonsalez inquired into the nature of the vehicle and was told that different people were parking there. Gonsalez did indeed find that the gas was turned off, boxes were piled on top of each other haphazardly and blocked the back door entrance to the property, and debris and garbage littered the interior. After 45 minutes of inspection, which included knocking on the door, observing the property, and talking with neighbors, Gonsalez received permission to proceed with the "initial secure" order. By removing one secondary lock on the premises, defendants were securing the property for entrance for repairs, not taking possession of the property for residential purposes.

¶ 55        We acknowledge that under Illinois law, the sanctity of the home and the inherent right to be free from intrusion are important principles of law. See, *e.g.*, Ill. Const. 1970, art. I, § 6. However, we note that plaintiff was aware that her property was in foreclosure and was in the redemption period. Moreover, knowing the legal status of her right to possession, she ignored the knocking on her door after observing two men and a van in her driveway. Her actions prevented Gonsalez and Centeno from introducing themselves and explaining their presence on the property. Further, once Gonsalez and Centeno found the property was occupied, they left the home and waited for the police. The interaction was not extreme or outrageous, and therefore, we decline to accept plaintiff's argument that defendants' entry into her home was sufficient, in and of itself, to be extreme and outrageous conduct.

¶ 56        We are not persuaded by plaintiff's contentions to the contrary. Plaintiff contends that by entering her home, defendants were taking possession. Plaintiff claims that, absent a court order finding that she had abandoned her home, defendants had no right to break in and seek to take possession. Plaintiff argues that, under Illinois mortgage foreclosure law, "the redemption period shall end on the date 30 days after the date the judgment of foreclosure is entered if the court finds that the mortgaged real estate has been abandoned." 735 ILCS 5/15-1603(b)(4) (West 2014). She further argues that foreclosure law regarding the "right to possession" establishes that a mortgagee is not entitled to possession of a mortgagor's home without a court order. 735 ILCS 5/15-1701 (West 2014). She maintains that, absent a court order granting Chase the right to enter the property, defendants had no right to enter her home.

¶ 57        We find plaintiff's reliance on foreclosure law unconvincing. As noted by the appellate court, there is a substantial difference between the right to possession for residential purposes, which these statutes address, and the contractual right to enter to make repairs. Contrary to plaintiff's argument that defendants had no legal justification for their entry into the property, plaintiff signed a note with the mortgage that contained a provision designated "protection of lender's rights in the property," which allowed Chase to enter the property to make repairs if plaintiff fell into default. "It is a rule universally recognized that a written contract is the highest evidence of the terms of an agreement between the parties to it, and it is the duty of every contracting party to learn and know its contents before he signs it." *Vargas v. Esquire, Inc.*, 166 F.2d 651, 654 (7th Cir. 1948). In the absence of fraud, which must be proved by clear and convincing evidence (*Bundesen v. Lewis*, 368 Ill. 623, 636-37 (1938)), a man in possession of all his faculties who signs a contract cannot relieve himself from the obligations of the contract by saying he did not know or understand what it contained (*Upton v. Tribilcock*, 91

- 12 -

U.S. 45, 50 (1875)). A person is presumed to know those things that reasonable diligence on his part would bring to his attention. *Hawkins v. Capital Fitness, Inc.*, 2015 IL App (1st) 133716, ¶ 14 (recognizing that the act of signing legally signifies that the individual had an opportunity to become familiar with and comprehend the terms of the document he or she signed); *Asset Exchange II, LLC v. First Choice Bank*, 2011 IL App (1st) 103718, ¶ 43 ("One is under a duty to learn, or know, the contents of a written contract before he signs it, and is under a duty to determine the obligations which he undertakes by the execution of a written agreement." (Internal quotation marks omitted.)); *Vargas*, 166 F.2d at 654.

¶ 58   Moreover, the judgment of foreclosure obtained by Chase stated that "[i]n order to protect and preserve the mortgaged real estate, it has or may also become necessary for [Chase] to pay fire and other hazard insurance premiums on the real estate or to make such repairs to the real estate as may reasonably be deemed necessary for the proper preservation thereof." Therefore, we find that Chase had the right to enter the property to make reasonable repairs for the preservation of the property. Although plaintiff argues that the house was not in need of repairs, she does not explain how defendants were to know or determine that.

¶ 59   In addition, we note that Safeguard's order instructed the subcontractors not to enter if the property was occupied and Gonsalez and Centeno undertook efforts attempting to determine the occupancy of the house for over 45 minutes. Furthermore, the evidence reveals that Gonsalez and Centeno were only instructed to change one secondary lock, which they attempted to do. We fail to see how removing one secondary lock to allow access to Chase for preservation services equates to taking possession of the property for residential purposes.

¶ 60   In sum, we cannot disagree with the appellate court that there may have been a better and more commonsense way to determine if the property was occupied. However, based upon this record in the context of mortgage foreclosure proceedings, it cannot be said that the entry, after which defendants left and never returned, is conduct so extreme and outrageous that it goes beyond all possible bounds of decency.

¶ 61   Therefore, since there is no question of fact as to whether the conduct of Gonsalez and Centeno could be deemed extreme and outrageous, summary judgment against plaintiff on her intentional infliction of emotional distress claim was proper. Our disposition renders unnecessary any discussion of the agency arguments raised by the parties. See, *e.g.*, *Standard Mutual Insurance*, 2013 IL 114617, ¶ 35.

¶ 62                                          III. CONCLUSION

¶ 63   We conclude that the appellate court's holding that plaintiff has no cause of action for negligent infliction of emotional distress is affirmed. The appellate court's granting of summary judgment in favor of defendants with regard to plaintiff's intentional infliction of emotional distress claim is also affirmed.

¶ 64   Appellate court judgment affirmed.

¶ 65   Cause remanded to the circuit court for further proceedings consistent with this opinion.

¶ 66   JUSTICE GARMAN, specially concurring:

¶ 67   I agree that under our long-standing precedents, the impact rule continues to apply to claims of negligent infliction of emotional distress (NIED). I write separately to note that the

- 13 -

basis for this court's holding in *Corgan v. Muehling*, 143 Ill. 2d 296 (1991), upon which our opinion relies, was rejected, at least in part, by our decision in *Clark v. Children's Memorial Hospital*, 2011 IL 108656, and to make a clear distinction between a claim of NIED and a claim of liability for negligence or other personal tort in which the act or omission of the defendant caused emotional distress for which damages may be recovered.

¶ 68     In *Corgan*, a former patient sued an unregistered psychologist for what she characterized in her count I as "PSYCHOLOGICAL MALPRACTICE" after he engaged in sexual intercourse with her "under the guise of therapy," causing her severe psychological symptoms requiring extensive treatment. *Corgan*, 143 Ill. 2d at 300. Her count III alleged that defendant breached his duty to her by his " 'conscious indifference and reckless disregard' " for her well-being by repeatedly engaging in " 'sexual intercourse with her under the guise of therapy.' " *Id.* at 301. Thus, both counts I and III sounded in negligence, specifically, professional malpractice.

¶ 69     In his motion to dismiss, the defendant inaccurately characterized count I as a claim of NIED and count III as a claim of intentional infliction of emotional distress (IIED). *Id.* She responded that count III stated a claim for negligence, not IIED. In response to defendant's motion to dismiss both counts, the circuit court certified the two questions for interlocutory review, asking whether this court's holding in *Rickey v. Chicago Transit Authority*, 98 Ill. 2d 546 (1983), barred her claims of emotional distress. *Corgan*, 143 Ill. 2d at 301-02.

¶ 70     Although the appellate court stated that count I was " 'in essence for negligence' " and that count II "was 'basically an action for negligence' " (*id.* at 302), the appellate court nevertheless treated both counts as claims of NIED. The appellate court concluded that *Rickey* was not applicable to her claims of NIED because she was a "direct victim" of the defendant's alleged negligent conduct rather than a bystander. *Id.*

¶ 71     After allowing the defendant's petition for leave to appeal, this court formulated the issue as whether "direct victims must set forth the pleading requirements established in *Rickey* when stating a cause of action for negligent infliction of emotional distress." *Id.* It answered the question in the negative, distinguishing between direct victim NIED cases and bystander NIED cases, which require that the plaintiff be in the zone of danger. *Id.* at 304. After observing that "the zone-of-physical-danger rule is patently inapplicable to direct victims" (*id.* at 305), this court also rejected any additional requirement that the NIED plaintiff plead and prove that the emotional distress caused by the defendant's negligence caused physical symptoms (*id.* at 312).

¶ 72     In reaching this holding, this court discussed *Siemieniec v. Lutheran General Hospital*, 117 Ill. 2d 230 (1987), in which the parents of a child born with hemophilia sued for wrongful birth and sought damages, including compensation for their resulting emotional distress. In that case, this court's analysis treated the parents as if they were "bystanders who were witnessing the effects of hemophilia" (*Corgan*, 143 Ill. 2d at 305) and said that they failed to state a claim for NIED because they failed to allege that they were in the zone of danger. *Siemieniec*, 117 Ill. 2d at 261-62. Thus, "the *Siemieniec* majority's mere failure to address the direct-victim/ bystander distinction [did] not amount to expansion of the zone-of-physical-danger rule to include direct victims." *Corgan*, 143 Ill. 2d at 305.

¶ 73     In *Clark*, this court expressly overruled *Siemieniec*, not on the basis of the distinction between a direct victim and a bystander, but on the basis of a distinction between the tort of NIED and the tort of negligence where the plaintiff seeks damages for emotional distress.

¶ 74    The parents in *Clark* claimed wrongful birth due to negligent genetic testing and counseling, alleging that they would not have conceived another child had the defendants provided them with accurate information about the risk of giving birth to a second child with a serious genetic abnormality. *Clark*, 2011 IL 108656, ¶ 5. The damages sought in the wrongful birth count included "the extraordinary costs of caring for [the child] during his minority" (*id.* ¶ 16) but not damages for the emotional distress they experienced as a result of the burden of raising a second severely disabled child. To recover damages for the emotional distress caused by the conduct of the defendants, they pleaded a separate count of NIED. *Id.* ¶ 17.

¶ 75    The appellate court reversed the circuit court's dismissal of the parents' NIED count, stating that "[i]n contrast to *Siemieniec*, plaintiffs in the present case have pleaded they are subject to physical pain, exhaustion, and emotional distress from caring for their son ***; they are subject to 'hitting, biting, and physical trauma' while caring for [him]; and they are thus within the zone-of-physical-danger caused by defendants' alleged negligence." *Clark v. Children's Memorial Hospital*, 391 Ill. App. 3d 321, 332 (2009). Thus, the appellate court held, the parents "adequately pleaded that they fall within the zone-of-physical-danger rule and therefore have stated a cause of action for negligent infliction of emotional distress." *Id.*

¶ 76    The defendants argued before this court that the appellate court's ruling was in conflict with *Siemieniec*. *Clark*, 2011 IL 108656, ¶ 96. We distinguished between a claim of NIED and a claim of professional negligence in which compensatory damages include compensation for emotional distress, explaining that "[w]here the claim of emotional distress is freestanding and not anchored to any other tort against the plaintiff, courts have applied special restrictions *** because of concerns regarding the possibility of fraudulent claims or frivolous litigation." *Id.* ¶ 106 (citing *Rickey*, 98 Ill. 2d at 555). Such special restrictions include the requirement of a contemporaneous physical impact or injury when the plaintiff claims to be a direct victim of NIED (*supra* ¶¶ 31, 38) and the requirement that the plaintiff be in the zone of physical danger in a bystander NIED claim (*Rickey*, 98 Ill. 2d at 550).

¶ 77    We acknowledged contributing to this misunderstanding in *Siemieniec* when we viewed damages sought for emotional distress in a professional negligence claim as a claim of NIED. *Clark*, 2011 IL 108656, ¶ 109. Further, we noted that:

> "[t]he nature of the error [of denying recovery of damages for emotional distress] is evident when one considers that damages for emotional distress are available to prevailing plaintiffs in cases involving other personal torts such as defamation (see, *e.g.*, *Slovinski v. Elliott*, 237 Ill. 2d 51 (2010)); conversion (see, *e.g.*, *Cruthis v. Firstar Bank, N.A.*, 354 Ill. App. 3d 1122 (2004)); and misappropriation of identity (see, *e.g.*, *Petty v. Chrysler Corp.*, 343 Ill. App. 3d 815 (2003)). See also 2 Dan B. Dobbs, Law of Remedies § 8.2, at 413-14 (2d ed. 1993) ('When it comes to mental or emotional distress, the usual rule allows free recovery of emotional distress damages to any victim of a personal tort.')." *Id.* ¶ 111.

¶ 78    Thus, we expressly overruled *Siemieniec*, stating that the zone-of-danger rule "applies only in cases where the plaintiff's theory of liability is the negligent infliction of emotional distress. It does not apply where *** a tort has already been committed against the plaintiffs and they assert emotional distress as an element of damages for that tort." *Id.* ¶ 113.

¶ 79    Like *Siemieniec*, *Corgan* was not really an NIED case. The plaintiff pleaded negligence, specifically professional malpractice, which resulted in emotional distress. *Corgan*, 143 Ill. 2d

at 300. Indeed, Chief Justice Miller specially concurred in *Corgan*, making just this point. *Id.* at 315 (Miller, C.J., specially concurring). He would have treated the case as an ordinary negligence/malpractice case, which is where the court eventually arrived in *Clark*, 20 years later. He noted that the duty at issue was the duty imposed by the therapist-patient relationship. *Id.* at 316. Notably, the majority in *Corgan* also concluded that the defendant, as a treating psychologist, owed a duty to the plaintiff and that he breached that duty by having sexual relations with her during the course of treatment. *Id.* at 307 (majority opinion). Such a breach of such a duty is grounds for finding negligence—even if damages are claimed for emotional distress.

¶ 80    In light of our reasoning in *Clark* and the majority opinion in the present case, it should be clear that when a plaintiff claims NIED, she must allege a contemporaneous physical impact or injury as a direct result of the defendant's conduct or else that she was a bystander in the zone of physical danger. If, however, she states a claim for a tort other than NIED, no such additional pleading requirement applies.

¶ 81    In the present case, while the plaintiff cannot state a claim for NIED in the absence of a contemporaneous physical impact or injury directly resulting from the defendants' entry into her home, her other claims are still pending in the circuit court. Whether any of these claims succeeds, whether damages for emotional distress are available for the particular claim, and whether she proves her entitlement to such damages remain to be seen.