In the

# United States Court of Appeals

## For the Seventh Circuit

No. 16-3846

CLAUDIA MANLEY and
NOEL MANLEY,

*Plaintiffs-Appellants,*

*v.*

BRUCE LAW and
HINSDALE TOWNSHIP HIGH SCHOOL DISTRICT 86,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 15-CV-7499 — **Edmond E. Chang**, *Judge.*

ARGUED OCTOBER 24, 2017 — DECIDED MAY 10, 2018

Before EASTERBROOK, ROVNER, and HAMILTON, *Circuit Judges.*

HAMILTON, *Circuit Judge.* American politics is not for the thin-skinned. In this case, a dispute between an elected school board member and a student outside a high school play escalated quickly. The school board launched an investigation into the board member's alleged bullying of the student. The

board member and her husband filed this lawsuit, originally
to try to stop the investigation. After that did not work, the
plaintiffs asserted that the school board and superintendent
violated their federal constitutional rights by conducting the
investigation and publicly criticizing the board member for
her handling of the dispute with the student. The Due Process
Clause of the Fourteenth Amendment, plaintiffs tell us, pro-
tects their emotional well-being and entitles them to feel that
the government treated them fairly. We affirm the district
court's grant of summary judgment dismissing the case.

I.   *Factual and Procedural Background*

Because the plaintiffs appeal the grant of summary judg-
ment against them, we view the facts in the light reasonably
most favorable to them, giving them the benefit of all infer-
ences drawn from the evidence in the record. *Brunson v. Mur-
ray*, 843 F.3d 698, 701 (7th Cir. 2016). This does not mean, how-
ever, that we vouch for the objective truth of all the facts pre-
sented. *Id.*

Plaintiff Claudia Manley was a member of the school
board for Hinsdale Township High School District 86 in Du-
Page County, Illinois. In the winter of 2015, the district was
preparing for a contested election in April for three school
board seats. Manley was not up for reelection, but her allies
on the board were. On the evening of March 12, 2015, Manley
got into a verbal altercation with a student who was leaf-
letting for Manley's political opponents outside a high school
play. Manley insisted that the leafletting violated school board
policy.

The altercation between Manley and the student sparked
a wider controversy. The student accused Manley of bullying,

and a wave of support for the student crashed against Manley. The night of the incident, the student's parents called Manley and left her several voicemails. When those messages were not returned, the student and her parents pursued a public campaign to embarrass Manley that included online petitions, newspaper articles, and comments at public meetings, all aimed at removing Manley from her position on the board. As the pressure increased, the school district's superintendent, defendant Bruce Law, began an investigation into Manley's behavior outside the play. After Law announced the investigation, Manley and her husband Noel filed suit in state court to enjoin the investigation.

No injunction was issued, and the investigation ended with no change in Manley's legal rights or legal status. Manley has alleged bias and unfairness on the part of the board, the superintendent, and his investigator, but the investigation ended with nothing more than a public report finding that Manley violated a board policy calling for "mutual respect, civility and orderly conduct" at school events. The board adopted the investigative report's findings and formally admonished Manley for violating the board's policy and for overstepping her authority in attempting to enforce unilaterally the district's leafletting policy. Manley is no longer on the school board, but not because of district action against her. She decided not to seek reelection in 2017.

As these events unfolded, the Manleys' lawsuit evolved in state court from an action to enjoin the investigation to a suit seeking a declaratory judgment that numerous alleged procedural irregularities violated state and local law. The amended

complaint, however, also sought damages that "might, for example, be awarded pursuant to the remedies provided by 42 U.S.C. § 1983."

Based on this reference to relief under a federal statute for alleged federal constitutional violations, the defendants removed the suit to federal court. The plaintiffs fought to support their federal claims. Both sides moved for summary judgment, and the district court granted the defendants' motion. The court found that the plaintiffs failed to offer evidence of a required element of a due process claim: the deprivation of a constitutionally recognized liberty or property interest. The district court also found that Noel Manley lacked standing to assert his federal claims. With no remaining questions of federal law and no diversity of citizenship between the parties, the district court declined to exercise supplemental jurisdiction over the plaintiffs' state law claims through 28 U.S.C. § 1367, remanding the remaining claims to state court. Plaintiffs have appealed. We review *de novo* the district court's grant of summary judgment. *Brunson*, 843 F.3d at 704.

## II. *Analysis*

Bitter disagreements and harsh words are not new to American politics. Nearly two centuries ago, Tocqueville wrote that in American politics, "electioneering intrigues, the meanness of candidates, and the calumnies of their opponents … are occasions of enmity which occur the oftener, the more frequent elections become." Alexis de Tocqueville, 2 Democracy in America 125 (Henry Reeve trans., 1862). The legal system leaves most of these matters to the political process, not the courts.

The Constitution does not guarantee good feelings or regulate manners in political disputes. Toward the ends of liberty and self-rule, the Constitution's embrace of free speech and popular elections ensures robust and sometimes even rude public discourse. These side effects of liberty and representative government are well-known. If the transient evils of "an election accidentally severs two friends, the electoral system brings a multitude of citizens permanently together …. Freedom produces private animosities, but despotism gives birth to general indifference." *Id.* at 125.

These insights form the foundation of *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964), where the Supreme Court described "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *Id.* at 270. More recently, Justice Scalia observed that public accountability for political acts "fosters civic courage, without which democracy is doomed." *Doe v. Reed*, 561 U.S. 186, 228 (2010) (Scalia, J., concurring in the judgment). That courage is needed because of the sometimes harsh and unfair attacks on public officials and candidates. As we said, American politics is not for the thin-skinned, even, or perhaps especially, at the local level.

Neither does the Constitution forbid official investigations carried out by public officials, even when undertaken for political reasons. Framer and Justice James Wilson found in our tradition the power of legislators to act as "grand inquisitors of the realm." James Wilson, *Considerations on the Nature and Extent of the Legislative Authority of the British Parliament*, in 3 The Works of the Honourable James Wilson, L.L.D. 199, at

219 (1804). Writing of the British House of Commons, he observed: "The proudest ministers of the proudest monarchs have trembled at their censures; and have appeared at the bar of the house, to give an account of their conduct, and ask pardon for their faults." *Id.*

Congress has assumed that investigative power over public officials since the Nation's birth. See David P. Currie, *The Constitution in Congress* at 20–21, 163 (1997); *Kilbourn v. Thompson*, 103 U.S. 168, 189–90 (1881) ("[T]he Constitution expressly empowers each House to punish its own members for disorderly behavior."). In the First Congress, the House of Representatives decided it had authority to investigate the Superintendent of Finance of the United States under the Articles of Confederation. James Madison supported the investigation, saying that the legislature "should possess itself of the fullest information in order to doing justice to the country and to public officers," 2 Annals of Cong. 1515 (1790), and Madison's view prevailed. In its early years, Congress exercised this power in other circumstances, often investigating and criticizing Secretary Alexander Hamilton's administration of the Treasury Department. See 3 Annals of Cong. 899–906 (1793); 4 Annals of Cong. 465–466 (1794). If Congress may investigate and censure public officials for political purposes, a local school board's admonishment of a member is not likely to be the stuff of constitutional violation. Against this backdrop, we proceed to the specific legal questions at hand.

A.  *Procedural Due Process*

The Due Process Clause imposes basic procedural obligations on the government—in most cases, prior notice and a meaningful opportunity to be heard—before it deprives a person of life, liberty, or property. *Cleveland Board of Education v.*

*Loudermill,* 470 U.S. 532, 542 (1985). When a state or local government violates these obligations, 42 U.S.C. § 1983 may authorize an award of damages against the government and/or its officers. These damages may include compensation for intangible emotional harm and even nominal damages where no actual injury occurs. *Carey v. Piphus*, 435 U.S. 247, 263–64, 266 (1978). This does not mean, however, that every person who suffers harm traceable to procedurally questionable government actions can recover damages from the government. Before a plaintiff can recover any damages at all, he or she must first establish that a due process violation occurred. See *Carey*, 435 U.S. at 266; *Babchuk v. Indiana University Health, Inc.*, 809 F.3d 966, 969 (7th Cir. 2016). To establish a violation, the plaintiff must show that he or she was deprived of a liberty or property interest at issue in the case. See *Paul v. Davis*, 424 U.S. 693, 711 (1976); *Babchuk*, 809 F.3d at 969.

Procedural due process does not protect every conceivable legal interest. The doctrine requires that the interest meet three requirements relevant to this case. First, the affected interest must have a foundation in state or federal positive law. *Paul v. Davis*, 424 U.S. at 710–11 & n.5. Second, the interest must be a freestanding entitlement and not contingent on post-injury administrative or judicial processes for recognition. *Id.* at 712. Third, the interest must itself be substantive rather than procedural in nature. *Cromwell v. City of Momence*, 713 F.3d 361, 364 (7th Cir. 2013); *Cain v. Larson*, 879 F.2d 1424, 1426 (7th Cir. 1989).

The Manleys argue here that the investigation and reprimand impaired three interests that should be protected under the Due Process Clause: a feeling of fair-dealing on the part of the government; their mental and emotional well-being; and

entitlement to processes mandated by the state and the district itself. Each of these interests fails at least one of the requirements for a viable due process claim.

### 1. *Fair Dealing by the Government*

The plaintiffs claim a liberty interest in "a feeling that the government has dealt with [them] fairly." To the extent the plaintiffs identify a positive law basis for this purported interest, they claim it resides in the procedural component of the Due Process Clause. They do not base any claim on any substantive aspect of due process. As *Paul v. Davis* makes clear, however, the procedural component of the Due Process Clause does not provide substantive rights itself. 424 U.S. at 701 (procedural due process does not "*ex proprio vigore* extend to [plaintiffs] a right to be free of injury wherever the state may be characterized as the tortfeasor"). The plaintiffs' argument that they have a liberty interest in a feeling of fair-dealing through the clause itself fails.

The plaintiffs have not directed us to cases recognizing a protected liberty or property interest in a feeling that the government is dealing fairly with anyone. They rely on the Supreme Court's statement in *Carey v. Piphus* that "a purpose of procedural due process is to convey to the individual a feeling that the government has dealt with him fairly." 435 U.S. at 262. From this statement, the Manleys argue that if a law has a certain purpose, "it follows logically that the result is an 'interest' protected by the law." That conclusion does not follow from the premises. An "interest" in procedural due process doctrine is not an amorphous "interest" in the general meaning of that word. As far as we know, no court has gone so far as to say, as the plaintiffs argue, that the United States Constitu-

tion requires state and local government officials to avoid upsetting other public officials and candidates affected by their actions or words. This unprecedented theory's threat to robust public debate is obvious. The district court properly rejected it.

### 2. *Emotional Well-Being*

The plaintiffs also argue that the defendants deprived them of a protected liberty interest in their emotional well-being. Emotional well-being, unlike the more elusive subjective feeling of fairness, is recognized in state law, at least in some situations. States protect limited personal interests in emotional well-being through the torts of intentional and negligent infliction of emotional distress and through compensatory damages for emotional distress tied to other tort liability. See, e.g., *Schweihs v. Chase Home Finance, LLC*, 77 N.E.3d 50 (Ill. 2016). This limited interest has not been recognized as an independent liberty interest protected by due process.

Procedural due process protects only interests that are freestanding entitlements protected against injury or deprivation, independent of procedural protections granted by law. The Supreme Court made this clear in *Paul v. Davis* when it held that procedural due process does not protect reputational interests because Kentucky did not create a freestanding "legal guarantee of present enjoyment of reputation" altered by the state's branding that individual an active shoplifter. 424 U.S. at 711. Instead, the Court explained, an individual's "interest in reputation is simply one of a number which the State may protect against injury by virtue of its tort law, providing a forum for vindication of those interests by means of damages actions." *Id*. at 712.

The same is true here. Illinois does not create a freestand-
ing legal guarantee of present enjoyment of emotional well-
being. Instead, it protects people from certain negligent and
intentional actions that injure them. E.g., *Schweihs*, 77 N.E.3d
50. Any legal protection of emotional well-being is contingent
on tort doctrines. When a tortious injury causes physical
harm, compensatory damages are available for harm to emo-
tional well-being, but when a tortious act causes no physical
harm, emotional damages are available only if the act was ex-
treme or outrageous and undertaken with the knowledge and
intent that the action would likely result in severe emotional
harm. *Id.* at 59, 63. Since plaintiffs must prove these injuries
and damages in court, the substantive restrictions of tort law
and the procedural requirements of the state judicial process
shape whatever liberty interest might be derived from the
plaintiffs' claim.

The nature of this process itself determines what process
might be due to the plaintiffs here: access to the courts to pur-
sue a tort claim against the defendants. The Manleys have not
argued that any defendant or the state itself has deprived
them of the ability to pursue these claims. If the plaintiffs be-
lieve they have viable claims under state law, they may be able
to pursue them in state court.

To support their claims to a federally protected liberty in-
terest in emotional well-being, the plaintiffs again rely on
*Carey v. Piphus*. In that case, the Supreme Court determined
that students who received lengthy school suspensions with-
out an opportunity to respond to the charges against them
could recover damages for this due process violation even if
in the end the suspensions were justified. 435 U.S. at 249–50,

262–63. To recover damages exceeding a nominal sum, however, the students had to show that they suffered compensable harm traceable only to the denial of a hearing—that is, to the due process violation itself—and not traceable to justified suspensions. *Id.* at 263.

The plaintiffs misread the case in two ways. First, *Carey* did not decide whether a due process violation occurred, let alone whether people have a right to a hearing before the government takes action that upsets them. The case decided only the availability of certain damages once a due process violation has been established. *Id.* at 262–64. The defense in *Carey* simply did not contest the district court's holding that a school's suspension of students without procedural protections violated due process. *Id.* at 251 n.5. This points to plaintiffs' second error. The underlying liberty interest in *Carey* was not emotional well-being, as the plaintiffs argue, but a state entitlement to public education that the Court recognized as a protected liberty interest in *Goss v. Lopez*, 419 U.S. 565 (1975). No similar entitlement is involved in this case.

Plaintiffs' reliance on *Alston v. King*, 231 F.3d 383 (7th Cir. 2000), is also misplaced. The plaintiff in *Alston* was a city official whose employment contract entitled him to a hearing before he could be fired. He was fired summarily, without the promised hearing, and he ultimately showed both a breach of contract and a due process violation. We held that the district court had erred in limiting the due process damages to nominal damages, at least as a matter of law, because the plaintiff had offered at least some evidence that the denial of a hearing was itself humiliating. *Id.* at 389. The underlying due process violation in *Alston* was not contested or decided on appeal, however. See *Alston v. King*, 157 F.3d 1113, 1116–17 & n.5 (7th

Cir. 1998) (opinion from earlier appeal). *Alston* did not hold that emotional distress alone is sufficient to prove a denial of due process, which is plaintiffs' theory in this case.

### 3. *Procedural Interests*

The plaintiffs alleged in their complaint that the school district did not follow board policy or state procedural law in the investigation. To the extent that the plaintiffs maintain the school district denied them a constitutional right to these legally prescribed processes, their claim fails. Even when required by statute or ordinance, purely procedural rules of state and local law give rise to constitutionally protected interests only when the mandated procedure contains within it a *substantive* liberty or property interest. *Cromwell*, 713 F.3d at 364. In other words, the federal Constitution does not enforce compliance with state procedural rules. E.g., *Swarthout v. Cooke*, 562 U.S. 216, 221–22 (2011) (per curiam) (due process does not require federal courts to review "the application of all state-prescribed procedures in cases involving liberty or property interests").

For example, a government promise that an employee can be fired only for good cause creates a substantive property right in secure employment, whether or not the government provides procedures to enforce that right. *Id.* By contrast, a rule that "merely provides procedures to be followed does not include a substantive right" if the procedures protect nothing more than employment that can be terminated at will. *Miyler v. Village of East Galesburg*, 512 F.3d 896, 898 (7th Cir. 2008); accord, e.g., *Cain*, 879 F.2d at 1426 ("It is by now well-established that in order to demonstrate a property interest worthy of protection under the fourteenth amendment's due process

clause, a party may not simply rely upon the procedural guarantees of state law or local ordinance."). The plaintiffs have identified no substantive liberty or property interest attached to the procedural rules they claim the district violated.

B. *Remaining Matters*

The plaintiffs also argue that the federal Declaratory Judgment Act, 28 U.S.C. § 2201, provides authority to adjudicate their due process claim. That Act offers no independent basis for the plaintiffs' federal claims. The lack of a protected liberty or property interest defeats those claims on the merits, regardless of the nature of the relief sought. To the extent the plaintiffs seek a declaratory judgment of their rights under state law, the federal Declaratory Judgment Act provides no basis for doing so. The Act provides no independent source of federal subject-matter jurisdiction. *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671 (1950). The district court wisely chose to decline to exercise supplemental jurisdiction over the remaining state-law claims, and the plaintiffs have not challenged that decision on appeal.

Finally, the district court gave lack of standing as an alternative reason for dismissing Noel Manley's claims. It is clear that Claudia Manley has standing and that Noel's claims all derive from hers. Deciding whether Noel's federal claims fail on the merits or for lack of standing would make no difference. No relief is available to Noel under federal law. We need not decide more here. The district court's judgment is

AFFIRMED.