# Illinois Official Reports

## Appellate Court

---

### *Kramer v. Szczepaniak*, 2018 IL App (1st) 171411

---

| | |
|---|---|
| Appellate Court Caption | SEAN KRAMER and NANCY CORONEL, Plenary Guardian of the Estate and Person of Jasmine Vega, a Disabled Person, Plaintiffs-Appellants, v. JOHN SZCZEPANIAK, a/k/a John Szcpenqniak; FARID KESSANTI; SALAH BACHIR; CAB INVESTMENT GROUP, INC.; and UBER TECHNOLOGIES, Defendants (Farid Kessanti; Salah Bachir; Cab Investment Group, Inc.; and Uber Technologies, Defendants-Appellees). |
| District & No. | First District, Third Division<br>Docket No. 1-17-1411 |
| Filed | December 19, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 14-L-10679; the Hon. Kathy M. Flanagan, Judge, presiding. |
| Judgment | Reversed and remanded. |
| Counsel on Appeal | Kevin J. Golden, of Dudley & Lake, LLC, of Chicago, and Lynn D. Dowd and Jennifer L. Barron, of Naperville, for appellants.<br><br>Kimberly A. Jansen, Peter A. Walsh, and Albert C. Angelo, of Hinshaw & Culbertson LLP, of Chicago, for appellee Farid Kessanti.<br><br>Melissa A. Murphy-Petros and Loren S. Cohen, of Wilson Elser Moskowitz Edelman & Dicker LLP, of Chicago, for appellee Uber Technologies. |

No brief filed for other appellees.

Panel          JUSTICE ELLIS delivered the judgment of the court, with opinion. Presiding Justice Fitzgerald Smith and Justice Howse concurred in the judgment and opinion.

**OPINION**

¶ 1     After a late night at the movies, Jasmine Vega and Sean Kramer requested a ride home using the popular ride-sharing app Uber. Defendant Farid Kessanti responded to the request, and with that, Vega and Kramer began their journey home. According to the complaint, Kessanti proved to be a less than able driver: He did not know how to get to Vega's and Kramer's intended destination, took several wrong turns, and got lost. When Kramer pointed this out to Kessanti and offered to help with directions, Kessanti became irate and kicked Vega and Kramer out of his car—at around two in the morning.

¶ 2     Unable to find another ride and thus left to walk the rest of the way home, Vega and Kramer departed and, in due course, arrived at the intersection of 43rd Street and Kedzie Street. While crossing Kedzie in a crosswalk, Vega and Kramer were hit by a driver—defendant John Szczepaniak—who was speeding and failing to keep a proper lookout, resulting in significant injuries to Kramer and Vega.

¶ 3     Kramer and Nancy Coronel, in her capacity as Vega's guardian, filed this negligence action against Szczepaniak, Kessanti, Uber, Cab Investment Group, Inc., and Salah Bachir, the person who lent Kessanti the car he was driving. In response, all defendants but Szczepaniak moved to dismiss, claiming that plaintiffs failed to state a claim because they did not—and could not—allege facts that, if proved, would establish that the car accident causing Vega's and Kramer's injuries was reasonably foreseeable. The circuit court agreed and dismissed those portions of the complaint with prejudice.

¶ 4     We reverse. Proximate cause is typically a question of fact. It is here, as well, at least at this preliminary stage. Taking the allegations as true and drawing all reasonable inferences in plaintiffs' favor, reasonable minds could differ as to whether the car accident was a foreseeable result of Kessanti ejecting Vega and Kramer from his vehicle in the middle of the night, abandoning them in a dimly lit, high-traffic area where cars were driving recklessly and patrons were leaving a number of bars and taverns. We cannot say, as a matter of law, that the negligence of Kessanti (and thus Uber) bore no causal relationship to Kramer and Vega's injuries. The complaint should not have been dismissed.

¶ 5                                   BACKGROUND

¶ 6     The following facts are taken from plaintiffs' seventh amended complaint, the operative pleading in this case. On the night of October 4, 2014, Vega and Kramer went to a movie theater located at 322 East Illinois Street in Chicago. After the movie was over, at approximately 1:30 a.m. on the morning of October 5, 2014, Vega used the Uber application

on her smartphone to request a ride for her and Kramer to their home at 4138 South Albany Street in Chicago. At approximately 2 a.m., Kessanti accepted Vega's ride request.

¶ 7 Suffice it to say, the ride did not go smoothly. Kessanti "did not drive the proper route to 4138 South Albany." Instead, he made multiple wrong turns and got lost. When Kramer pointed this out to Kessanti and attempted to give him directions, Kessanti became angry, stopped the car, and kicked Vega and Kramer out, even though they had not yet arrived at their destination. Vega and Kramer acceded to Kessanti's demand and left his car in an area near 44th Street and Homan Avenue, an area the complaint alleges to be a "high-crime area."

¶ 8 Vega and Kramer began walking home. Their path eventually led them to the intersection of 43rd Street and Kedzie Street. While crossing Kedzie Street, Vega and Kramer were struck by a vehicle traveling southbound on Kedzie driven by defendant John Szczepaniak. Szczepaniak's vehicle was speeding, and he failed to yield to pedestrians in the crosswalk. Szczepaniak did not stop after hitting Vega and Kramer. He was apprehended the following day and is currently incarcerated. Kramer was injured, and Vega was severely injured by the hit-and-run.

¶ 9 On October 15, 2014, plaintiffs sued Szczepaniak for negligence. On March 5, 2015, they filed their first amended complaint, adding Uber as a defendant. Second and third amended complaints followed. With respect to Uber and Kessanti, the circuit court dismissed plaintiffs' first, second, and third amended complaints, reasoning that Kramer had not alleged facts that could establish how Kessanti's wrongful ejection was the proximate cause of Vega's and Kramer's injuries. The dismissal of the third amended complaint was with prejudice. However, after extensive procedural wrangling that we need not detail here, the circuit court reconsidered its order of dismissal and permitted plaintiffs to further amend, ultimately resulting in the filing of a seventh amended complaint against Uber and Kessanti (among others).

¶ 10 In count V of his seventh amended complaint, Kramer alleged that Uber "knew or reasonably should have known that it was not safe to wrongfully eject" Vega and Kramer in the area of 44th Street and Homan Avenue because, among other things, (1) they were unfamiliar with the area; (2) it was "dark, poorly illuminated and *** certain street lights were not operating"; (3) there was no "visible police or other law enforcement presence"; (4) the area "presented an increased risk of injury *** from other traffic, from other third parties, from the roadway or sidewalks that may have been in a state of disrepair, and from not having immediate, alternative transportation available to exit the locale"; (5) there was a "high volume of traffic and limited traffic control devices"; (6) "third parties departing various drinking establishments and in a [*sic*] various states of insobriety, aggression or other unsafe state of mind were present"; (7) "motor vehicles were speeding and driving dangerously," creating "an increased risk of personal injury to pedestrians"; and (8) the area "presented an increased risk of being a victim of a crime or other accident inflicted by a third party or another motor vehicle."

¶ 11 Kramer alleged that Uber breached its duty of care to Vega and Kramer by, among other things, (1) kicking Vega and Kramer out of his car before reaching their destination after he voluntarily agreed to transport them home; (2) allowing Kessanti to utilize the Uber app to transport customers despite knowing that Kessanti was mentally and physically unfit and had "a history of confrontation, wrongful discharges, and arguments with other [Uber] customers"; (3) failing to "do the appropriate background check on Kessanti before allowing him to

transport customers in the City of Chicago"; and (4) failing to train Kessanti to ensure that he "would never drop a passenger off at a destination other than the destination directed by the customer." With respect to causation, Kramer and Coronel alleged, "[i]t was reasonably foreseeable that one or more of the foregoing acts or omissions would cause, in whole or in part," the injuries to plaintiffs.

¶ 12 Counts VI and VII were largely duplicative of count V. Count VI, which incorporated count V by reference, purported to state a claim for negligence based on an alleged violation of section 9-112-020 of the Chicago Municipal Code (Chicago Municipal Code § 9-112-020 (amended May 28, 2014)). Section 9-112-020 regulates taxicab services and specifically requires that taxicab drivers obtain a chauffeur's license to operate a cab in the City of Chicago. Kramer alleged that Kessanti never obtained a chauffeur's license and that Uber's act of permitting Kessanti to drive for Uber despite not having a chauffeur's license was a proximate cause of their injuries.

¶ 13 In a similar vein, count VII alleged that (1) Uber voluntarily undertook to drive Vega and Kramer home, (2) Uber breached that undertaking, and (3) Vega and Kramer's injuries were proximately caused by Uber's breach of its voluntary undertaking. Likewise, counts II and III, which were against Kessanti for negligence based upon a voluntary undertaking and common-law negligence, were functionally indistinguishable from counts IV and VII. Count IV, which was against Bachir, alleged that Bachir negligently entrusted his vehicle to Kessanti when, among other things, he knew that Kessanti was unfit, in general and specifically for Uber, and that Vega and Kramer were injured as a proximate result of Bachir's negligence.

¶ 14 On April 17, 2017, Uber moved to dismiss counts V through VII of Kramer's seventh amended complaint. The same day, Bachir and Cab Investment Group, Inc. moved to dismiss count IV. A week later, Kessanti followed suit and moved to dismiss counts II and III. Each motion sought relief pursuant to section 2-615 of the Code of Civil Procedure. See 735 ILCS 5/2-615 (West 2016). In its motion, Uber urged that Vega's and Kramer's injuries were not proximately caused by Kessanti's alleged negligence—that Kessanti's conduct, at most, "furnished a condition making possible the injury caused by the independent illegal acts" of the negligent driver, Szczepaniak.

¶ 15 In his motion, Kessanti raised the same argument. He reasoned that "the fact that the Plaintiffs would be hit by a speeding driver while [plaintiffs] were crossing the street in a crosswalk a number of blocks from where the alleged wrongful ejection occurred, was not foreseeable to Mr. Kessanti," and that the negligent driver's conduct "was the superseding, intervening, and sole proximate cause of the accident." Bachir's motion followed the same trajectory, arguing that "the negligent driving of co-defendant John Szczepaniak striking the plaintiffs with his vehicle while they were crossing Kedzie Avenue on foot was the intervening act of a third person which broke the causal connection between the alleged negligent entrustment of a vehicle to *** Kessanti and the injuries caused by Szczepaniak."

¶ 16 On May 8, 2017, the circuit court granted each motion. It reasoned that it was not foreseeable that dropping off plaintiffs "in a different location than the requested location would result in them being hit by a negligent driver when they attempted to cross the street blocks away from where they were dropped off without incident." The trial court ruled that the actions of Szczepaniak, in "driving his vehicle negligently so as to strike the Plaintiffs as they were crossing the street in a crosswalk blocks away from where they exited the vehicle was an intervening, superseding cause of the Plaintiffs' injuries that broke any causal chain stemming

from the acts of the Co-Defendants." The court thus dismissed the complaint with prejudice as to defendants Uber, Kessanti, Bachir, and Cab Investment Group. The court entered a finding pursuant to Illinois Supreme Court Rule 304(a). See Ill. S. Ct. R. 304(a) (eff. Mar. 8, 2016). This appeal followed.

¶ 17                                    ANALYSIS

¶ 18    On appeal, plaintiffs claim that the circuit court erred by dismissing counts II through VII of their seventh amended complaint pursuant to section 2-615. We must first address the issue of forfeiture. In their respective briefs, Uber and Kessanti maintain that plaintiffs forfeited the proximate cause issue by failing to file a written response to defendants' motions to dismiss the seventh amended complaint.

¶ 19    The complaint in this case went through several iterations. Defendants filed multiple motions to dismiss, and plaintiffs responded, raising arguments that were the same or similar to the arguments raised in defendants' motions to dismiss the seventh amended complaint. Through those many iterations, the trial court consistently ruled that Kramer's and Vega's injuries were not reasonably foreseeable and thus plaintiffs could not establish proximate cause as a matter of law. The trial court had dismissed the sixth amended complaint on that ground as well.

¶ 20    Thus, when the viability of the seventh amended complaint came before the trial court, the court explicitly deemed additional briefing unnecessary, as the trial court was clearly well versed with the case law, the allegations, and the parties' respective positions by that point. It would be grossly unfair to thus blame plaintiffs for "failing" to respond to the motion to dismiss the seventh amended complaint or to suggest that they forfeited arguments that they vigorously contested throughout this lengthy pleading process. We find no forfeiture and turn to the merits.

¶ 21                                         I

¶ 22    A section 2-615 motion tests the legal sufficiency of a complaint. *Schweihs v. Chase Home Finance, LLC*, 2016 IL 120041, ¶ 27. When ruling on a section 2-615 motion, we must take as true all well-pleaded facts in the complaint. *Id.* "The critical inquiry is whether the allegations of the complaint, when considered in a light favorable to the plaintiff, are sufficient to state a cause of action upon which relief may be granted." *Id.* Our review is *de novo*. *Id.*

¶ 23    Kramer's negligence claims against Uber and Kessanti were based on three theories of liability: common-law negligence, statutory negligence, and voluntary undertaking. Though each theory differs in some respects, they all share one feature in common: Each requires that the plaintiff plead and prove that the defendant's alleged negligence was the proximate cause of the plaintiff's injury. *Thompson v. Gordon*, 241 Ill. 2d 428, 438 (2011) (common-law negligence); *Munizza v. City of Chicago*, 222 Ill. App. 3d 50, 56 (1991) (statutory negligence); *Bruntjen v. Bethalto Pizza, LLC*, 2014 IL App (5th) 120245, ¶ 60 (voluntary undertaking).

¶ 24    Proximate cause is a two-part inquiry. *First Springfield Bank & Trust v. Galman*, 188 Ill. 2d 252, 257-58 (1999). First, the defendant's act or omission must be the cause in fact of the plaintiff's injury. *Id.* Second, the defendant's conduct must be the legal cause of the plaintiff's injury. *Id.*

The trial court did not base its dismissal on the absence of cause in fact. Uber conceded in its brief and at oral argument that plaintiffs had adequately pleaded cause in fact. But Kessanti does not, and because we may affirm the dismissal on any basis in the record (*CNA International, Inc. v. Baer*, 2012 IL App (1st) 112174, ¶ 31), we will consider the question of cause in fact.

A defendant's negligence is the cause in fact of a plaintiff's injuries if there is a "reasonable certainty" that a defendant's acts caused the injury or damage. *Lee v. Chicago Transit Authority*, 152 Ill. 2d 432, 455 (1992). When, as here, the plaintiff's injury "results not from the defendant's negligence directly but from the subsequent, independent act of a third person," courts determine cause in fact by employing the "substantial factor" test. *Galman*, 188 Ill. 2d at 258-59.

There can be more than one cause of a plaintiff's injury. *Douglas v. Arlington Park Racecourse, LLC*, 2018 IL App (1st) 162962, ¶ 34. A cause-in-fact analysis does not require a court to pick the last or most significant act of negligence; rather, "[a] defendant's conduct is a material element and a substantial factor in bringing about an injury if, absent that conduct, the injury would not have occurred." *Galman*, 188 Ill. 2d at 258; *Abrams v. City of Chicago*, 211 Ill. 2d 251, 258 (2004); *Walker v. Chicago Housing Authority*, 2015 IL App (1st) 133788, ¶ 49 (citing *Galman*, 188 Ill. 2d at 258).

The complaint more than adequately pleads cause in fact. The only reason Kramer and Vega were crossing Kedzie Avenue at two in the morning is that they were forced to walk home, after being kicked out of the Uber vehicle. "[A]bsent that conduct" in wrongfully expelling Kramer and Vega from the Uber vehicle, "the injury would not have occurred." See *Galman*, 188 Ill. 2d at 258; *Abrams*, 211 Ill. 2d at 258.

Defendants invoke the " 'condition vs. cause' dichotomy." See *Galman*, 188 Ill. 2d at 257. Under the condition/cause analysis, when a plaintiff is injured by the intervening act of a third party, the defendant can be held liable for the plaintiff's injury if the defendant's actions actually brought about the injury, but not if the defendant's actions only created a condition that made the injury possible. *Id.*; see *Thompson v. County of Cook*, 154 Ill. 2d 374, 383 (1993); *Briske v. Village of Burnham*, 379 Ill. 193, 199 (1942); *Merlo v. Public Service Co. of Northern Illinois*, 381 Ill. 300, 316-17 (1942).

We can style the analysis by any name; it is the same cause-in-fact analysis. As our supreme court explained: "[W]hen *Briske*, *Merlo*, and *Thompson* ask whether the defendant's conduct was a cause of the injury or simply furnished a condition by which the injury was made possible, they are in effect asking whether the defendant's conduct was a material and substantial element in bringing about the injury." *Galman*, 188 Ill. 2d at 259; see *Knauerhaze v. Nelson*, 361 Ill. App. 3d 538, 554 (2005) ("[D]efendants' claim that Dr. Allen's failure to terminate the surgery merely created a condition in which an injury could occur is tantamount to saying that Dr. Allen's negligence was not the cause in fact of Knauerhaze's injury ***.").

*Galman* itself is a good example. There, a tanker truck was parked illegally on Lawrence Avenue in Springfield, close to an intersection. *Galman*, 188 Ill. 2d at 254. The plaintiff's decedent was a student at a nearby high school, leaving school for the day. Rather than use the crosswalk to cross Lawrence, she walked west on the sidewalk along Lawrence for the full length of the truck, then turned at the front of the massive vehicle and crossed Lawrence at a 45-degree angle. *Id.* She was hit by a car whose driver couldn't see her, as she had been

obscured by the tanker truck. *Id.* at 255. The plaintiff sued the truck company and the driver, arguing that his negligence in illegally parking the truck was a proximate cause of the decedent's death. *Id.*

¶ 33    The defendants argued that the illegal parking of the vehicle was merely a condition by which the injury was made possible and the intervening, superseding negligence of the decedent in jaywalking across Lawrence was the proximate cause of her injuries. *Id.* at 256-57. The supreme court, after noting that the condition/cause analysis was simply a restatement of the cause-in-fact analysis (see *id.* at 257-59), reiterated that "in deciding whether a defendant's conduct was a material and substantial element in bringing about an injury, we ask whether, absent the defendant's conduct, that injury still would have occurred." *Id.* at 260. That question was easily answered: "had [the driver] not parked his truck illegally on Lawrence Street, [the decedent's] injuries almost certainly would not have occurred." *Id.* Thus, the plaintiff had established that the driver's negligence was a cause in fact of the decedent's injuries.

¶ 34    So whatever verbiage defendants use, the analysis ultimately remains the same. Without question, the accident here would not have occurred absent Kessanti's conduct in expelling Kramer and Vega from the Uber vehicle, leaving them to walk home instead of being driven to their destination. The complaint adequately alleges that Kessanti's negligence was a material and substantial factor in causing the injuries alleged here. The complaint sufficiently pleads cause in fact.

¶ 35                                          B

¶ 36    "A defendant's acts are a *legal* cause only if they are 'so closely tied to the plaintiff's injury that he should be held legally responsible for it.' " (Emphasis in original.) *Simmons v. Garces*, 198 Ill. 2d 541, 558 (2002) (quoting *McCraw v. Cegielski*, 287 Ill. App. 3d 871, 873 (1996)). "The question is one of public policy—how far should a defendant's legal responsibility extend for conduct that did, in fact, cause the harm?" *Young v. Bryco Arms*, 213 Ill. 2d 433, 446 (2004). The touchstone of legal causation is foreseeability. *City of Chicago v. Beretta U.S.A. Corp.*, 213 Ill. 2d 351, 395 (2004).

¶ 37    In cases such as this, where the plaintiff was actually injured by the intervening act of a third party, the inquiry "is whether the first wrongdoer reasonably might have anticipated the intervening efficient cause as a natural and probable result of the first party's own negligence." *Galman*, 188 Ill. 2d at 257. That remains true even if, as here, a defendant argues the condition/cause theory, which again merely restates the law of proximate cause and is not a distinct doctrine. See *id.* at 259 ("[W]hen *Briske*, *Merlo*, and *Thompson* ask whether the defendant might have reasonably anticipated the intervening efficient cause as a natural and probable result of his or her own negligence, they are in effect asking whether the intervening efficient cause was of a type that a reasonable person would see as a likely result of his or her conduct.").

¶ 38    So at bottom, the question is whether the intervening, negligent driving of Szczepaniak, in speeding and failing to yield to pedestrians in a crosswalk, was reasonably foreseeable to Kessanti (and thus by extension to Uber) after Kessanti ejected Kramer and Vega from the vehicle far away from their agreed-upon destination.

¶ 39    In so deciding, we must keep in mind our procedural posture. We are at the pleading stage, where we take the facts as true and draw all reasonable inferences in favor of the plaintiff; indeed, we may not dismiss a complaint under section 2-615 "unless it clearly appears that no

set of facts can be proved that would entitle the plaintiff to recovery." *Henderson Square Condominium Ass'n v. LAB Townhomes, LLC*, 2015 IL 118139, ¶ 61. In keeping with that principle, we have recognized that proximate cause is typically a question of fact; it should only be decided as a matter of law if the facts alleged demonstrate that a party would *never* be entitled to recover. *Quirke v. City of Harvey*, 266 Ill. App. 3d 664, 668 (1994); *Cannon v. Commonwealth Edison Co.*, 250 Ill. App. 3d 379, 381-82 (1993).

¶ 40    Again, the complaint alleges that the neighborhood where Kramer and Vega were ejected was "dark" and "poorly illuminated" and that "certain street lights were not operating." The complaint alleges a "high volume of traffic and limited traffic control devices" in this neighborhood.

¶ 41    The complaint also alleges that, as the events happened at two in the morning, this neighborhood included "third parties departing various drinking establishments and in *** various states of insobriety, aggression or unsafe state of mind," where cars "were speeding and driving dangerously." And this neighborhood "lacked a visible police or law enforcement presence."

¶ 42    The complaint thus alleges that, when Kramer and Vega were wrongly expelled from the Uber vehicle at two in the morning, they were forced to walk through a poorly lit area with limited traffic-control devices at a time when a fair number of intoxicated individuals were leaving bars and taverns. They were forced to cross streets in a high-traffic area where drivers were proceeding aggressively, and the likelihood of intoxicated drivers was as high as it would be at any time of the day or night. In this context, drawing all reasonable inferences in favor of plaintiffs, can we say that the danger of being hit by a car was so remote as to be unforeseeable as a matter of law? Our answer is no.

¶ 43    What, after all, would a reasonable person consider to be a foreseeable fear for someone who was abandoned on the side of the road under the circumstances alleged here—a dark, high-traffic urban area populated with bars and taverns at a time when individuals are leaving those drinking establishments?

¶ 44    One obvious concern would be the fear of crime—an assault or mugging. Another might be exposure to the elements, if the weather were sufficiently severe; say, for example, the passenger was forced to walk the rest of the way to her destination on an icy sidewalk and, while doing so, slipped and fell and sustained injuries. See, *e.g.*, *Trevino v. Flash Cab Co.*, 272 Ill. App. 3d 1022, 1030 (1995) (proximate causal relationship between taxi driver's wrongful ejection of passenger far from agreed-upon destination and passenger's subsequent fall on icy, snowy sidewalk was question of fact not amenable to summary judgment). Yet another might be the act of walking itself, if the passenger were not sufficiently able to walk and thus was injured as a result of being forced to do so. See, *e.g.*, *Ingham v. Luxor Cab Co.*, 93 Cal. Rptr. 2d 587, 594 (Ct. App. 2001) (taxi wrongfully ejected enfeebled passenger from vehicle far from destination; passenger fell while walking and suffered injuries; whether taxi's ejection was proximate cause of injuries was question of fact precluding summary judgment).

¶ 45    But a reasonable person might be concerned, as well, with being forced to cross major city streets (such as Kedzie Street, where the accident occurred) under these circumstances. It is no stretch to imagine that people leaving bars and taverns in "various states of insobriety" (as alleged here) might get behind the wheel of a car, and the risks of that unfortunate combination is not at all hard to imagine. See, *e.g.*, *Westin Operator, LLC v. Groh*, 2015 CO 25, ¶¶ 34-35 ("A reasonable person could foresee that a group of intoxicated individuals evicted from a

hotel might be involved in a drunk driving accident that causes injuries."); *Cullum v. McCool*, 432 S.W.3d 829, 835 (Tenn. 2013) ("The risk of harm presented by a belligerent, intoxicated person operating a motor vehicle is foreseeable. It is common knowledge that drunk driving directly results in accidents, injuries and deaths." (Internal quotation marks omitted.)).

¶ 46    Most of us have urged those close to us (or been urged by them) to take greater care on the roads late at night or in the wee hours of the morning, especially on weekends as here, some version of the "you-never-who-might-be-driving-at-that-time-of-night" speech. That concern would be at its peak if the route the expelled passenger was forced to take, by foot, was a poorly lit, high-traffic area where people were leaving bars and taverns and where cars were already speeding and operating recklessly, as alleged here.

¶ 47    The context matters. The facts matter. The danger to a pedestrian of being hit by a car would undoubtedly vary if we posited, for example, a passenger being expelled from the Uber vehicle in the middle of an interstate highway at midnight, versus being stranded in a deserted, rural town in broad daylight. This case obviously falls between those extremes. But taking the allegations here as true and drawing all reasonable inferences in favor of plaintiffs, we cannot say that the risk to Kramer and Vega of being hit by a reckless driver's car was so clearly unforeseeable as to be something we can decide at the pleading stage.

¶ 48    Our holding is consistent with the voluminous case law on the subject of intervening causation. Defendants rely heavily on two decisions of our supreme court, neither of which is inconsistent with our conclusion.

¶ 49    One that we already discussed above, in our cause-in-fact analysis, is *Galman*, 188 Ill. 2d at 254-255, where the student came from behind the defendant's parked tanker truck and jaywalked across Lawrence Avenue, only to be struck and killed by a driver who did not see her, given that she had been obscured by the truck. The supreme court found that plaintiff proved cause in fact but ultimately held that the plaintiff could not prove legal causation. The chain of legal causation was broken, the court ruled, by the decedent's negligence in jaywalking across Lawrence Avenue, not to mention doing so after emerging from behind a large truck that shielded her from the view of oncoming traffic. *Id.* at 262. The court reasoned that "nothing in [the driver's conduct in parking that truck near the intersection] increased the likelihood that a pedestrian would forgo an open crosswalk in favor of an obstructed and unlawful mid-block crossing." *Id.*; see also *id.* at 262 n.2.

¶ 50    That well-reasoned decision is perfectly compatible with our holding. The decedent there easily could have used the crosswalk; the parked tanker truck didn't prevent her from doing so. Her decision to jaywalk, and to do so while being obscured by the truck, was the decedent's decision alone, not caused in any way by the presence of the truck. The presence of the truck did nothing to set in motion a sequence of events. Here, in contrast, while Kessanti did not cause Szczepaniak to drive recklessly, he absolutely forced Kramer and Vega into a position where they would be vulnerable to that negligent driving. And we would add that *Galman* was decided after a trial, after a full airing of all available and relevant evidence, unlike here.

¶ 51    Defendants also cite *Abrams*, 211 Ill. 2d 251. The plaintiff called 911 to request an ambulance, as she was going into labor, with labor pains 10 minutes apart. *Id.* at 253. The dispatcher told the plaintiff that the situation was not an emergency and ended the call. *Id.* After the plaintiff's sister placed a second 911 call, a different dispatcher explained that labor pains at 10-minute intervals were not a medical emergency. *Id.* at 253-54. The plaintiff then unsuccessfully tried to enlist the services of a private ambulance company. *Id.* at 254-55. At

that point, the plaintiff called a friend, who agreed to drive the plaintiff to the hospital. *Id.* at 255.

On the way to the hospital, the friend's car approached the intersection of King Drive and Pershing. *Id.* Holding down the car horn to announce her approach, the friend entered the intersection on a red light, where she collided with a vehicle driven by Gregory Jones. *Id.* Jones was driving between 75 to 80 miles per hour at the time of the collision, and he admitted that, prior to the accident, he'd ingested crack cocaine, a beer, and two shots of rum. *Id.* As a result of the accident, the plaintiff was severely injured and spent two weeks in a coma; her baby died after delivery. *Id.*

The plaintiff sued the City of Chicago for refusing to provide her with ambulance service. *Id.* The circuit court awarded summary judgment to the City, reasoning that the City's conduct was not the proximate cause of the plaintiff's injuries. The appellate court reversed on the issue of proximate cause, but our supreme court reversed the appellate court and affirmed summary judgment for the city, reasoning:

> "[W]e conclude as a matter of law that the City could not have reasonably anticipated that a refusal to send an ambulance when labor pains are 10 minutes apart would likely result in plaintiff's driver running a red light at the same time that a substance-impaired driver was speeding through the intersection on a suspended license. Millions of women in labor make it safely to the hospital each year by private transportation. Thus, plaintiff was in no peril greater than that faced by women each day who make it safely to the hospital without the aid of an ambulance. The legal causes of the injury here were the two drivers in willful violation of the traffic laws, and not anything the City did or did not do. While all traffic accidents are to some extent remotely foreseeable [citation], this is not the kind of harm that was sufficiently foreseeable from the refusal to send an ambulance so as to satisfy the 'legal cause' portion of a proximate cause analysis." *Id.* at 261-62.

*Abrams* is easily distinguishable. First and most obviously, *Abrams* arrived in the supreme court in a different procedural posture; the circuit court resolved the issue of proximate cause at summary judgment, not the pleading stage. Second, the intervening negligence there involved not one but two different drivers—one a drunk driver going at least twice the speed limit, the other who deliberately ran a red light. And third, it was difficult to see how this negligence could be foreseen as a result of a hospital's failure to send an ambulance. As the court noted, women in labor routinely use private transportation, and the evidence showed that the plaintiff was not in a medical emergency. The hospital's conduct did not set in motion a chain of events; it did nothing to worsen the plaintiff's position. As we have already explained, we cannot say the same of Kessanti's negligence here.

The gist of defendants' argument, citing those supreme court cases and others we will address, is that "negligent driving" breaks the causal chain between the first defendant's negligence and a plaintiff's injuries "as a matter of law." That is often the case. But it is not always the case. And it is certainly not always a conclusion we can reach at the *pleading* stage. Like *Galman* and *Abrams*, most of the cases that find a lack of foreseeability "as a matter of law" do so at the summary judgment stage or after trial—that is, after the parties have had the opportunity to develop a record and put forth their best evidence.

First of all, as to the intervening cause: "Negligent driving" is not some one-size-fits-all proposition. It is not a talismanic phrase that will break every causal chain in every situation.

Some driving, to be sure, is so negligent that we might say it was beyond reasonable anticipation. For example, a driver's negligence in driving on a prohibited portion of the road under construction, followed by an illegal U-turn into oncoming traffic that caused an accident, could not be a reasonably foreseeable result of a city doing nothing more than performing construction work on the road and narrowing down the lanes of traffic to a single lane in each direction. *Newsome v. Thompson*, 202 Ill. App. 3d 1074, 1081-82 (1990). We said that as a matter of law, however, only after noting that the facts in that case were "largely undisputed." *Id.* at 1081.

¶ 57        The likelihood that a driver would be so negligent as to swerve over a median and cross onto the other side of the road was so minimal as to be unforeseeable as a matter of law—though we so held in affirming summary judgment, after the parties had taken extensive discovery, including fact and expert testimony. *In re Estate of Elfayer*, 325 Ill. App. 3d 1076, 1083-84 (2001). Nor is it foreseeable that a drunk driver, in an attempt to elude the police, would travel 80 to 85 miles per hour in a 35-mile-per-hour zone, though the supreme court rendered that judgment after a trial. *Thompson*, 154 Ill. 2d at 382-83.

¶ 58        In those cases, the intervening actions of the driver were so beyond the ordinary expectation of drivers that the defendant municipalities could not be expected to reasonably anticipate them.

¶ 59        But some "negligent driving" could be reasonably foreseeable. Take *Bentley v. Saunemin Township*, 83 Ill. 2d 10 (1980). The plaintiff's decedent was driving on a gravel road when he approached State Highway 47. *Id.* at 12-13. Despite the obvious nature of the major intersection, the driver failed to stop, entered the highway, and collided with an oncoming vehicle. *Id.* at 12. Plaintiff blamed the township, because there was a stop sign but it was obscured by branches of a tree. *Id.* Nevertheless, a jury found the driver's negligence, in failing to yield at the intersection, to be the sole proximate cause of the collision and returned a verdict for the township. *Id.* at 11.

¶ 60        Despite the deferential standard accorded to a jury verdict, our supreme court reversed and held that, while the driver's conduct was negligent, it was not the only cause of the accident. The court rejected the township's argument that the negligent driving was a superseding, intervening cause relieving the township of liability, holding instead that the driver's negligence in failing to appreciate the upcoming hazard was a foreseeable result of the township's failure to provide a fully visible stop sign. *Id.* at 15. The court did "not consider it reasonable to absolve defendants of responsibility because of [the driver's] shortcomings in dealing with a situation created by defendants' own negligence." *Id.* The court elaborated, quoting Professor Prosser:

> " 'The risk created by the defendant may include the intervention of the foreseeable negligence of others. *** [T]he standard of reasonable conduct may require the defendant to protect the plaintiff against 'that occasional negligence which is one of the ordinary incidents of human life, and therefore to be anticipated.' Thus a defendant who blocks the sidewalk and forces the plaintiff to walk in a street where he will be exposed to the risks of heavy traffic becomes liable when he is run down by a car, even though the car is negligently driven; and one who parks his automobile on the highway without lights at night is not relieved of responsibility when another negligently drives into it. By the same token, one who spills gasoline can expect it to be negligently set afire, and when a drunken passenger is ejected from a bus into the midst of traffic it

may be anticipated that he will be negligently run down.' " *Id.* at 16 (quoting William L. Prosser, Handbook of the Law of Torts, § 44, at 272-74 (4th ed. 1971)).

¶ 61    Likewise, we held that a driver's negligence in failing to yield to an emergency vehicle—a police car—could be viewed by a jury as a foreseeable result of a defendant's activation of a false alarm at a bank that caused the squad car to respond and thus dismissal at the pleading stage was inappropriate. *Duncan v. Rzonca*, 133 Ill. App. 3d 184, 204 (1985). We have noted that distracted driving, for another example, "can supply a basis for calling a driver negligent or careless, and no rational thinker could think such conduct would be legally unforeseeable" in a legal causation analysis. *Martinelli v. City of Chicago*, 2013 IL App (1st) 113040, ¶ 30.

¶ 62    We also held that the negligence of a driver in failing to see (and thus obey) a stop sign, resulting in a collision, could be a foreseeable result of a church's sponsorship of a treasure hunt that allowed participants to drive to various clue locations and encouraged fast and distracted driving by rewarding the first team to finish. See *Indlecoffer v. Village of Wadsworth*, 282 Ill. App. 3d 933, 942-43 (1996). Thus, we said there, "under the facts of this case as alleged in the *** amended complaint, we cannot say, as a matter of law, that the purported intervening acts were the kind of new and independent force that would break the causal connection between [defendant's] alleged negligence and plaintiffs' injuries." *Id.* at 943.

¶ 63    So it's not enough to simply argue that the driver who struck Kramer and Vega was "driving negligently," that Uber and its driver could not be expected to foresee negligent driving, and thus the causal chain was snapped the moment a negligent driver entered the picture. We must consider, among other things, the particulars of the "negligent driving."

¶ 64    Here, because we have an undeveloped record and only a complaint's allegations, we know very little about Szczepaniak's alleged negligence. The complaint tells us he struck Kramer and Vega as they were walking across Kedzie Street in a crosswalk. It tells us the driver drove his car "at a speed greater than reasonable and proper with regard to traffic conditions and the use of the roadway," that he "failed to decrease speed to avoid colliding with" Kramer and Vega, and he failed to yield to pedestrians. The complaint later adds that Szczepaniak was "traveling over the speed limit," but we do not know if he exceeded the limit by 5 miles or 45 miles per hour. We don't even know what the speed limit was.

¶ 65    The complaint tells us that the driver failed to yield to pedestrians in the sidewalk, but we do not know the details. Did he blow through a red light? Disobey a stop sign? How visible were the pedestrians to the driver? If that intersection did not have a traffic-control device and if it was dark, Szczepaniak might argue that he was unable to see the pedestrians until it was too late.

¶ 66    We cannot pretend that those details do not matter. Of course, they do. The amount we do not know about this accident far exceeds what we do. Ruling as a matter of law without knowing these details is not appropriate. See, *e.g.*, *Chevrie v. Gruesen*, 208 Ill. App. 3d 881, 884 (1991) (reversing summary judgment, as "[b]oth the question of a proper lookout and of speed appropriate to conditions are generally questions for the jury to decide"); *O'Brien v. Hertl*, 238 Ill. App. 3d 217, 221-22 (1992) (refusing to overturn jury's causation determination, as questions of proper lookout and speed appropriate to conditions are usually questions of fact for jury); *Santschi v. Gorter*, 63 Ill. App. 3d 394, 397 (1978) (reversing

- 12 -

summary judgment; though facts were "uncontroverted," they were capable of more than one conclusion as to whether defendant failed to keep proper lookout for oncoming vehicles).[1]

¶ 67　　In addition to considering the nature of the so-called intervening cause, we must also consider the nature of the wrongdoing of the first defendant in the causal chain. In the cases we have discussed above that absolved the first wrongdoer of liability because of a break in the causal chain, the original actor merely failed to do something, like failing to erect a crash-proof median (*Elfayer*), failing to warn of a curve in the road or of the possibility of an illegal U-turn (*Thompson*, *Newsome*), failing to send an ambulance in a nonemergent situation (*Abrams*), or simply parking a truck illegally (*Galman*). Nothing those defendants did, or failed to do, set in motion a chain of events of any kind. Indeed, no danger was within reasonable contemplation until a new force intervened—and a rather unusual and dramatic intervening force, at that. To use the vernacular of the condition/cause case law, " 'the forces set in operation by the defendant ha[d] come to a rest in a position of apparent safety, and some new force intervene[d].' " *Orrico v. Beverly Bank*, 109 Ill. App. 3d 102, 108 (1982) (quoting William L. Prosser, Handbook of the Law of Torts, § 42, at 247-48 (4th ed. 1971)).

¶ 68　　Consider, on the other hand, the cases we discussed above that found that the intervening act of negligent driving did *not* absolve the original tortfeasor of liability. In those cases, the effects of the negligence of the first actor had not come to rest in a position of safety.

¶ 69　　For example, the failure to trim branches to avoid obscuring a stop sign led the driver to not realize he was supposed to stop at the state highway, even though the driver shared some of the blame for not making that determination on his own. *Bentley*, 83 Ill. 2d at 15. Sending people off on a vehicular treasure hunt, where speed was rewarded, set in motion a chain of events where people drove their cars fast and while distracted, spending as much as time looking for clues from their car than watching out for stop signs; so while the driver would share some of the blame for not noticing a stop sign, the sponsor of the treasure hunt could not escape blame altogether. *Indlecoffer*, 282 Ill. App. 3d at 943. The effects of the defendant's negligence in falsely activating the robbery alarm at the bank caused a police officer to respond quickly to an emergency, which led to a collision with another car that negligently failed to yield to a police officer on an emergency call. *Duncan*, 133 Ill. App. 3d at 204. We specifically noted that the " 'forces set in operation' " there, the false activation of the alarm, would not have " 'come to rest in a position of apparent safety' " until the risk of harm created by the false alarm had passed—that is, when the police officer "arrived safely at the bank." *Id.* Both the negligent driver and the defendant who activated the false alarm could share in the blame, and thus it was error to decide proximate cause at the pleading stage. *Id.*

---

[1]Defendants tell us that Szczepaniak was driving while intoxicated at the time of the accident. The complaint says nothing of that fact, and we are limited at this stage to its well-pleaded allegations. See *Provenzale v. Forister*, 318 Ill. App. 3d 869, 878 (2001). Defendants say that we can judicially notice that Szczepaniak is incarcerated. So we can, but the only entry we have found from the Illinois Department of Corrections (IDOC) indicates that Szczepaniak was convicted of failing to report an accident involving injury, which is consistent with the complaint's allegations that Szczepaniak left the scene after his vehicle struck Kramer and Vega. The IDOC entry says nothing about intoxication. So at this stage, we do not "know" that the driver was intoxicated. We highly doubt that defendants are attempting to mislead us, which only underscores that there is still much to know about the details of this case.

- 13 -

¶ 70　　　The wrongdoing alleged here by Kessanti is nothing like the negligence of those defendants who were absolved of liability in the cases above and is far more analogous to the decisions that refused, as a matter of law, to find the causal chain broken. Kessanti's negligence was not passive. He did not merely fail to warn of a danger or park his car illegally. His wrongdoing was active. He dumped two passengers on the side of the road in the city of Chicago in the middle of the night amid dark, high-traffic streets. He materially *worsened* their position. At the time they were struck by the vehicle, Kramer and Vega were still "dealing with a situation created by [Kessanti's] own negligence." *Bentley*, 83 Ill. 2d at 15. Just as the police car in *Duncan* would not have come to rest in a "position of apparent safety" (*Duncan*, 133 Ill. App. 3d at 204) until the vehicle had arrived safely at the bank, so too, the effects of Kessanti's negligence would not have come to rest in a "position of safety" until Kramer and Vega made it home safely—the very service Kessanti had promised to provide them.

¶ 71　　　To repeat, there can be more than one proximate cause of an injury. *Bentley*, 83 Ill. 2d at 17; *Douglas*, 2018 IL App (1st) 162962, ¶ 34. This is not always a zero-sum game. We are not automatically forced to choose whether liability falls on the intervening negligent driving or the original wrongdoer's conduct; in some cases, it could be that both defendants' conduct was a cause. As our supreme court said, quoting Professor Prosser, if you eject a passenger from a bus amid traffic, it might be reasonably foreseeable that the person will be hit by a negligent driver. *Bentley*, 83 Ill. 2d at 16. If you prematurely expel a passenger from a taxi when the conditions are cold and icy, it might be reasonably foreseeable that the passenger will walk without due care for her safety and thus slip and fall on an icy sidewalk. *Trevino*, 272 Ill. App. 3d at 1030. Both actors could be responsible in part for the resulting injuries.

¶ 72　　　Here, at least so far as we can discern from nothing more than a complaint, a jury could reasonably conclude that *both* defendants were at fault. Szczepaniak could be liable for unsafe, reckless driving, but Uber and its driver could be liable for thrusting Kramer and Vega into a position where they had to cross that street in the first place.

¶ 73　　　In sum, we know far too little about the details of the "negligent driving" of Szczepaniak, as well as the conditions that night, to hold that Szczepaniak's conduct was so beyond the pale as to be unforeseeable as a matter of law, at the pleading stage. And because Kessanti's wrongful ejection of Kramer and Vega forced them into the very situation that required them to cross a major, dimly lit street at two in the morning, it would be premature to hold, as a matter of law, that Kessanti's conduct played no role whatsoever in their injuries.

¶ 74　　　We are not holding that Szczepaniak's alleged negligent driving was reasonably foreseeable or that Kessanti's actions were a proximate cause of this incident. At this early stage, with so many critical facts missing, it would be inappropriate to reach a conclusion as a matter of law, one way or the other. We hold only that questions of fact exist, precluding dismissal. We reverse the dismissal of counts II through VII and remand for further proceedings.

¶ 75　　　　　　　　　　　　　　　　　　II

¶ 76　　　Three final points. First, although Kramer appealed the dismissal of the counts against Bachir and Cab Investment Group, Inc., neither of those defendants appeared in this court or otherwise participated in the appeal. But the dismissal of the counts against them was based on the same argument as those against Uber and Kessanti. We can decide an appeal without the benefit of an appellee's brief, particularly when we have excellent briefs on the same issue

from the other appellees. See *First Capitol Mortgage Corp. v. Talandis Construction Corp.*, 63 Ill. 2d 128, 133 (1976). Our disposition of this appeal applies to all counts dismissed.

¶ 77 Second, we note that Uber has advanced arguments in its appellate brief that Kramer's claims arising under various provisions of the Chicago Municipal Code are defective for reasons other than lack of proximate cause. The circuit court never ruled on those arguments, and we decline to do so in the first instance.

¶ 78 Third, we note Kramer's argument on appeal that dismissal was inappropriate because certain documents that he believes were relevant to the issue of foreseeability were not produced by Uber. As we have reversed the judgment below for a different reason, that question is not necessary for us to decide here. We trust that the circuit court's limitation on discovery was grounded in the fact that the discovery was taking place at the pleading stage, before the parties were even at issue. Now that we have remanded for further proceedings, and more traditional and liberal discovery will soon commence, we assume the trial court would revisit any discussion about limitations on discovery.

¶ 79 CONCLUSION

¶ 80 The circuit court's judgment is reversed. The cause is remanded for further proceedings.

¶ 81 Reversed and remanded.