2025 IL App (1st) 230777-U

SECOND DIVISION
June 30, 2025

No. 1-23-0777

**NOTICE**: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| TAMMI JONES, as Independent Administrator of the | ) | Appeal from the |
| Estate of TEVIN JONES-ROGERS, deceased, | ) | Circuit Court of |
|       Plaintiff-Appellant, | ) | Cook County |
| | ) | |
| v. | ) | 20 L 6557 |
| | ) | |
| AUTO WAREHOUSING COMPANY and | ) | Honorable |
| FORD MOTOR COMPANY, | ) | Gerald Cleary |
|       Defendant-Appellees. | ) | Judge Presiding |

_____

JUSTICE ELLIS delivered the judgment of the court.
Justices McBride and Howse concurred in the judgment.

**ORDER**

¶ 1    *Held*: Affirmed. Court properly entered summary judgment for defendants, as plaintiff could not establish proximate cause as matter of law.

¶ 2    Lot 7 is a massive parking lot where Auto Warehousing Company (AWC), a defendant here, keeps thousands of vehicles that have rolled off the Chicago Ford Assembly Plant nearby. (Ford Motor Company is the other defendant.) As is standard practice in the industry, and because the cars that are kept there move in and out quickly, the keys are kept in each car when they're on the AWC lot.

¶ 3    In the early morning hours of April 25, 2017, under the cover of darkness, five people climbed a fence surrounding Lot 7 in south Chicago. Each person got into a different car and

sped past the security guard station at the lone entrance to the lot. A short investigation discovered a few other cars had been stolen the day before; one was a Ford Explorer.

¶ 4 Four days after the theft of that Explorer, on April 28, Chicago police received a report of gunshots near 120th and Peoria streets, about six miles away from Lot 7. The officers who responded drove to the scene of the report and noticed the Explorer about a block from where the reported shots had been heard. When officers made eye contact with the driver, Marvin Gibson-Jones, he sped off.

¶ 5 The police chased him. The Explorer eventually neared 127th and Throop Streets, where another driver, Tevin Jones-Rogers, was entering the intersection in his car. The Explorer barreled through a red light, collided with Tevin's car, and killed him. Gibson-Jones tried to flee but was eventually arrested and later charged with reckless homicide.

¶ 6 Tammi Jones, the administrator of Tevin's estate, sued AWC and the Ford Motor Company, arguing that leaving the keys in the cars and lax security around Lot 7 contributed to Tevin's death. The circuit court disagreed, finding that the defendants did not owe a duty to Tevin, nor was the theft of the Explorer the proximate or legal cause of his death, and granted summary judgment for the defendants. We agree that Jones could not establish proximate cause as a matter of law and thus affirm on that ground.

¶ 7                                   BACKGROUND

¶ 8 We take the facts from the parties' motions for summary judgment and attached exhibits. The Chicago Ford Assembly Plant churns out 1,200 finished vehicles a day. To move those cars from the factory line and prepare them for distribution around the country, Ford hired AWC, which keeps finished cars on various lots near the plant. One of the permanent lots AWC uses is known as Lot 7, which stores about 1,000 vehicles.

¶ 9    Because there are so many cars and they are moved frequently, the keys for each vehicle are kept inside them when they are on the lot. At times, a vehicle may be on the lot for no more than an hour or two. As AWC's terminal manager, Christopher Kwilosz, put it, there "is absolutely no way" to remove the key from a car, keep it in a secured location, and track them in the time it takes to move the cars around the lot. Thus, he testified, keeping the keys in the car while they are on the lot is standard practice in the automobile logistics industry.

¶ 10    That practice proved a prime opportunity for some thieves in April 2017. At the time, the perimeter of Lot 7 was completely enclosed by an eight-foot fence, and heavy concrete barriers limited access to the lot to a single entrance and exit lane. That entry was blocked by a large traffic pole barrier which, if struck by a car driving through it, would lift out of the way. A security guard kept watch over the entry and exit way from a shack, which was manned every hour of every day. There also were security cameras that fed closed-circuit footage into AWC's main office, but those feeds were not always monitored. And at night, between 10 p.m. and 6 a.m., a guard roamed the lot in a car for added security.

¶ 11    AWC moved, transferred, and stored 1,200 vehicles a day for Ford, or more than 400,000 per year. The evidence showed that thefts from Lot 7 were rare. Kwilosz, the terminal manager, testified in pretrial discovery that he did not know of any cars that had been stolen prior to April 2017. Joseph Gulik, AWC's operations manager, said that he believed that multiple cars had been stolen in one other night from the lot, most likely a year earlier in 2016, but he could not remember how many or when exactly.

¶ 12    At about 1:21 a.m. on April 25, 2017, five people climbed the fence at Lot 7, got into five vehicles, and quickly drove them off the lot past the security checkpoint. AWC employees immediately called the police, who responded and prepared a police report. None of the stolen

cars were found on the day they were taken.

¶ 13    While investigating the theft of those five vehicles, AWC discovered that five other cars had been stolen the night before, on April 24, 2017. That night, the thieves got away with the cars after pretending to be AWC employees. The thieves tucked in behind actual AWC employees who were moving cars off the lot and then made off with the vehicles after getting past the security checkpoint. At the time, nobody realized the cars had been stolen. One of these cars stolen from the previous night, April 24, was a Ford Explorer. When AWC discovered the additional thefts, they reported them to Chicago Police as well.

¶ 14    A few days later, on April 28, 2017, two Chicago police officers, Thomas Fennell and Michael Mancha, were patrolling the south side of Chicago in an unmarked squad car when they responded to a report of gunshots near 120th and Peoria Streets. About a block from where the reported shots were heard, they saw the Ford Explorer speeding down the street.

¶ 15    The officers suspected the Explorer had been involved in the shooting and activated their emergency lights and siren. The Explorer's driver, Marvin Gibson-Jones, quickly sped off. Police gave chase. There is no evidence that the police knew the Explorer had been stolen when the chase began; they were responding to the call of gunshots. During the chase, the Explorer reached speeds of 70 to 80 miles per hour and may have hit 100 miles per hour at moments.

¶ 16    Meanwhile, plaintiff's decedent, Tevin Jones-Rogers, was in a separate vehicle and approaching the intersection of 127th and Throop Streets in Chicago. Gibson-Jones, in the Explorer, sped through the intersection, running a red light, and crashed into Tevin's car, killing Tevin. Gibson-Jones fled on foot but was apprehended. He was charged with reckless homicide.

¶ 17    There is no evidence in the record as to who stole the Explorer, where it traveled or otherwise what happened to it in the days between its theft and the crash that killed Tevin, or

how Gibson-Jones came to be driving it.

¶ 18    In June 2020, Tammi Jones, Tevin's mother and the independent administrator of his estate, filed a wrongful death complaint in the circuit court against AWC and Ford on the grounds that their negligent acts or omissions were the proximate cause of Tevin's death. After discovery, the defendants moved for summary judgment. The court granted the motion. In a written order, the court concluded that the defendants did not owe a duty to Tevin, nor were the actions of the defendants in permitting the Explorer to be stolen the proximate or legal cause of the accident. This appeal follows.

¶ 19                                      ANALYSIS

¶ 20    The purpose of summary judgment is not to try a question of fact but to determine if a genuine issue of material fact exists in the first place. *Adams v. Northern Illinois Gas. Co.*, 211 Ill. 2d 32, 42-43 (2004) Summary judgment is proper when the pleadings, depositions, admissions, and affidavits on file, when viewed in the light most favorable to the non-moving party, show there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Id.* at 43. Our review is *de novo*. *Id.*

¶ 21    Jones brought this case under the Wrongful Death Act. See 740 ILCS 180/0.01 *et seq.* (West 2024). A plaintiff must show that (1) the defendants owed a duty to the deceased; (2) the defendants breached that duty; (3) the breach was the proximate cause of the deceased's death; and (4) pecuniary damages occurred to persons designated under the Act. *Rodgers v. Cook County, Illinois*, 2013 IL App (1st) 123460, ¶ 31. Here, the circuit court concluded that defendants did not owe a duty to Jones' son, nor was the defendants' actions the proximate or legal cause of the collision.

¶ 22    Jones attacks both conclusions on appeal, but we may affirm on either basis. We do not

reach the question of duty, as we agree with the circuit court that, as a matter of law, Jones cannot establish that any purported negligence by defendants was the proximate cause of Jones-Rogers's death. *Abrams v. City of Chicago*, 211 Ill. 2d 251, 257 (2004). Though proximate cause is ordinarily a question of fact for a jury, summary judgment is appropriate when the facts presented show that the plaintiff would never recover as a matter of law. *Id.* at 257-58.

¶ 23    Proximate cause is a two-part inquiry. *First Springfield Bank v. Galman*, 188 Ill. 2d 252, 257-58 (1999). First, the defendants' act or omission must be the cause-in-fact of the plaintiff's injury. *Id.* Second, the defendants' conduct must be the legal cause of the plaintiff's injury. *Id.; see Kramer v. Szczepaniak*, 2018 IL App (1st) 171411, ¶ 24. We focus here on the second prong, the legal cause.

¶ 24    A defendant's acts are the legal cause of a plaintiff's injury only if they are " 'so closely tied to the injury that they should be held legally responsible for it.' " *Kramer*, 2018 IL App (1st) 171411, ¶ 36 (quoting *Simmons v. Garces*, 198 Ill. 2d 541, 558 (2002)). Legal cause largely centers around *foreseeability*; the question is whether the plaintiff's injury is the type that a reasonable person would foresee as a likely result of his or her actions. *Id.*; *Abrams*, 211 Ill. 2d at 258; *City of Chicago v. Beretta U.S.A. Corp.*, 213 Ill. 2d 351, 395 (2004).

¶ 25    Here, unquestionably, we have an intervening act between the defendant's alleged negligence and the accident—the reckless driving of the Explorer's driver. Obviously, nothing AWC or Ford did, in failing to secure the Explorer, made the driver of the stolen vehicle become a suspect in a shooting, drive away at dangerous speeds, run a red light and kill another motorist four days later and six miles from the lot. In these instances, we ask whether the intervening act, itself, was a reasonably foreseeable result of the alleged negligence of the first wrongdoers. *Galman*, 188 Ill. 2d at 257; *Roach v. Castro*, 2021 IL App (1st) 192260-U, ¶ 25 (cited for

persuasive purposes under Supreme Court Rule 23(e)); *Kramer*, 2018 IL App (1st) 171411, ¶ 37.

¶ 26    Simply put, our question is whether AWC and Ford could have reasonably foreseen that, four days after their failure to secure this automobile, someone driving that vehicle would become a suspect in a shooting, elude police at dangerously high speeds, run a red light in doing so, and crash into Jones in an intersection.

¶ 27    Sympathetic as we are to the decedent and his family, our answer must be no. Leaving the keys in the car and failing to properly secure the lot "may have been a contributing reason for the theft *** but it was not the proximate cause of the plaintiff's injuries which thereafter resulted from the tortious operation" of the Explorer by Gibson-Jones. *Childers v. Franklin*, 46 Ill. App. 2d 344, 355 (1964) (affirming judgment in favor of defendant, who left his car unlocked and keys in ignition, resulting in theft of vehicle and subsequent accident that injured plaintiffs).

¶ 28    As defendants here note, though every case is different, we have often found proximate cause lacking as a matter of law when, as here, the theft of a car is remote in both time and distance to the accident that results in the plaintiff's death.

¶ 29    Consider *Phillips v. Budget Rent-A-Car Systems, Inc.*, 372 Ill. App. 3d 155 (2007). A thief made off with a rental car from a private lot at O'Hare Airport because the keys were left in the car. *Id.* at 158-59. Eight days later, and 26 miles away, police located the stolen car and, knowing it was stolen, chased after it, leading to a crash that injured the plaintiff. *Id.* at 159. This court affirmed summary judgment for the rental-car company, among other reasons, because "the remoteness of time and distance prevented the establishment of proximate cause." *Id.* at 166.

¶ 30    We also find persuasive our decision in *Roach*, 2021 IL App (1st) 192260-U, ¶ 4, where the defendant, Castro, left his Dodge Durango running at a gas station while he walked inside to pay for the gas, resulting in the theft of his car. Ten days later, the plaintiff's decedent was a

passenger in the stolen Durango and was involved in an accident resulting in her death. *Id*. ¶ 5. Her estate sued Castro for wrongful death, alleging that his negligence in leaving the car running proximately caused her death. This court affirmed the dismissal of the complaint, finding that as a matter of law, no set of circumstances could lead to a finding of proximate cause, "because it was not reasonably foreseeable that Castro's negligence would cause a collision resulting in [the decedent's] death ten days later and three miles away." *Id*. ¶ 24. Simply put, "Castro's alleged negligence was too remote in time and space from [the decedent's] death to be a proximate cause of it." *Id*. ¶ 30.

¶ 31    Both *Phillips* and *Roach* relied on *Stanko v. Zilien*, 33 Ill. App. 2d 364, 369 (1961), where this court again affirmed summary judgment in favor of a car dealer under similar circumstances. The court held, as matter of law, that the car dealer's failure to secure its vehicle on the lot, resulting in theft, was not the proximate cause of an accident that occurred 12 days after and five miles in distance from the lot where the vehicle was stolen. *Id*.

¶ 32    If anything, plaintiff's argument for proximate cause here is weaker than in *Phillips*, as the police chase in *Phillips* was prompted by the officers identifying the vehicle as stolen. Here, in contrast, the officers responded to a report of gunshots, which drew them to the Explorer upon their arrival. The attenuation between the theft and the accident was thus greater here than in *Phillips*. And *Roach* was decided at the pleading stage, without the benefit of discovery. Here, plaintiff had the opportunity for discovery before the entry of summary judgment.

¶ 33    Jones cites *Martinelli v. City of Chicago*, 2013 IL App (1st) 113040, for the proposition that "it would be 'remarkably unusual' for a trial court to decide proximate cause as a matter of law." Though the words "remarkably unusual" appear in that decision, what we refused to do there was to overturn a jury verdict on proximate cause, particularly after the jury had returned a

special interrogatory identifying the defendant as a cause of the plaintiff's injury. *Id*. ¶ 24. Our point there was it would be "remarkably unusual" (*id*.) to overturn a jury verdict in that context; the case otherwise bears no factual resemblance to our case.

¶ 34 Every case is different. There are no bright-line rules here. The outcome might be different were the circumstances of the injury less remote. For example, had the accident happened while the thief was making good his escape, perhaps a different result might obtain. See *Ney v. Yellow Cab Co.*, 2 Ill. 2d 74, 75-76 (1954). Or maybe the facts would be more compelling if the record showed a slew of car thefts from Lot 7 and resulting vehicular accidents. See *Hallmark Insurance Co. v. Chicago Transit Authority*, 179 Ill. App. 3d 260 (1989).

¶ 35 But here, we cannot even say that the driver of the Explorer at the time of the accident was the person who stole it. We do not know what became of the stolen vehicle in the four-day window from the time it was taken from the lot until the accident. The theft of the vehicle was not even directly related to the reason the police gave chase in the first place. And the best the record reveals is one previous theft of vehicles from Lot 7, which holds up to 1,000 cars at any given time and from which some 400,000 cars move in and out annually.

¶ 36 It would stretch the bounds of proximate cause too far to hold defendants liable for a crash that occurred four days after the original theft and six miles away, especially when the chase that ended in the crash was started by an unrelated police investigation. We affirm the circuit court's judgment on proximate cause and do not reach the question of duty.

¶ 37 CONCLUSION

¶ 38 The judgment of the circuit court is affirmed.

¶ 39 Affirmed.